UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

-------------------------------X
LAWRENCE HARDY,

      Plaintiff,

    -against-

THE CITY OF NEW YORK, THE CITY OF
NEW YORK DEPARTMENT OF CORRECTION,
CORRECTION OFFICER PATRICK DORVIL,
BADGE NO. 11544, FRANTZ MEDARD,
M.D. AS AGENTS, SERVANTS, AND
EMPLOYEES OF THE CITY OF NEW YORK
DEPARTMENT OF CORRECTION, OFFICER
RICKY REYNOLDS, OFFICER BRIAN
LEWIS, OFFICER GEORGE LEWIS,
OFFICER THOMAS LEWIS, NURSE ANN
DALECKI, P.A. NORIEL DEGUZMAN,
KAMAL PATHAK, M.D., AS AGENTS,
SERVANTS, AND EMPLOYEES OF THE NEW
YORK STATE DEPARTMENT OF
CORRECTIONAL SERVICES and JOHN and
JANE DOES (Medical Providers,
Police & Correction Officers in the
Employ of THE CITY OF NEW YORK
DEPARTMENT OF CORRECTION and NEW
YORK STATE DEPARTMENT OF
CORRECTIONAL SERVICES).

        Defendants.

-------------------------------X

<u>MEMORANDUM AND ORDER</u>

Civil Action No.
CV-09-0166(DGT)

Trager, J.:

    Lawrence Hardy ("Hardy") brings this action against

numerous New York City and New York State defendants as a result

of his allegedly unlawful arrest on October 15, 2007, and

subsequent incarceration from October 15, 2007, to March 11,

2008.  Just prior to his arrest, Hardy had been diagnosed with

an ear condition.  This condition deteriorated significantly during his subsequent incarceration, ultimately necessitating several surgeries and lengthy rehabilitation.  Hardy's primary claim is that the staff of various facilities gave unconscionably little attention to this ear problem, amounting to deliberate indifference to his serious medical condition in violation of 42 U.S.C. § 1983, conspiracy in violation of 42 U.S.C. § 1985 and municipal liability.  Read at its broadest, Hardy's complaint can also be construed to allege: (1) false arrest under state law and 42 U.S.C. § 1983; (2) assault and battery; (3) malicious prosecution; and (4) negligence in hiring, retention and training of employees.  Defendants to this action include the City of New York (the "City"), the City of New York Department of Correction ("NYCDOC"), Correction Officer Patrick Dorvil, Badge No. 11544 ("Officer Dorvil," together with the City and NYCDOC, "City defendants"), Frantz Medard, M.D. ("Dr. Medard"), Officer Ricky Reynolds ("Officer Reynolds"), Officer Brian Lewis ("Officer B. Lewis"), Officer George Lewis ("Officer G. Lewis"), Officer Thomas Lewis ("Officer T. Lewis," together with Officers Reynolds, B. Lewis and G. Lewis, the "Willard Correction Officers"), Nurse Ann Dalecki ("Nurse Dalecki"), P.A. Noriel DeGuzman, Kamal Pathak, M.D. ("Dr. Pathak," together with the Willard Correction Officers, Nurse Dalecki and P.A. Noriel DeGuzman, "State defendants") and other

unnamed medical providers, police officers and correction officers in the employ of NYCDOC and New York State Department of Correctional Services ("NYS DOCS") (collectively referred to as "defendants").

All defendants have filed motions to dismiss. Defendant Dr. Medard moves to dismiss Hardy's § 1983 deliberate indifference claim against him under Fed. R. Civ. P. 12(b)(6), or in the alternative, moves for summary judgment pursuant to Fed. R. Civ. P. 56. City defendants move to dismiss Hardy's amended complaint pursuant to Fed. R. Civ. P. 12(b)(6) for failure to state a claim. State defendants move to dismiss the amended complaint pursuant to Fed. R. Civ. P. 12(b)(1), 12(b)(6) and 12(d). For the reasons explained below, defendants' motions are granted in part and denied in part.

**Background**

**(1)**

**Pertinent History of Medical Treatment and Incarceration**

For reasons explained _infra_, defendants' motions are treated as motions for summary judgment with respect to Hardy's claims of deliberate indifference to his medical needs. Accordingly, the following facts are based upon Hardy's amended complaint as well as the medical records submitted along with the parties' motion papers.

On October 6, 2007, Hardy sought medical attention at Woodhull Hospital emergency room in Brooklyn, New York ("Woodhull") for pain he was experiencing in his left ear. Pl.'s Aff. Opp'n Defs.' Mot. Dismiss, Ex. D ("Pl.'s Ex. D") at 21; see also Am. Compl. ¶ 26; Tr. Pl.'s § 50-h Hr'g Test. ("50-h Test.") at 11.[1] Hardy was given an appointment to see an ear, nose and throat ("ENT") specialist the following day. 50-h Test. at 11-12. When Hardy returned for the appointment, the ENT specialist said that there was "something wr[o]ng, but he didn't know exactly what," and Hardy was given another follow-up appointment for October 18, 2007.[2] 50-h Test. at 12; Am. Compl. ¶ 27.

**a. Arrest**

Before this follow-up appointment could occur, however, Hardy was arrested by police officers for an alleged parole violation. Am. Compl. ¶¶ 28-32; 50-h Test. at 12-16. Hardy claims that on October 15, 2007, police officers entered his grandmother's residence "looking to serve a warrant for someone who was renting a room there in 2005." 50-h Test. at 13. Hardy

---

[1] Hardy's 50-h Testimony comes from a hearing held on August 12, 2008, pursuant to New York's General Municipal Law § 50-h, and a transcript of this hearing is annexed to Hardy's amended complaint.

[2] Medical records from Woodhull indicate that Hardy was diagnosed with a foreign body in his left ear. Pl.'s Ex. D at 34.

does not know how the police officers entered the residence. 50-h Test. at 13. After entering the residence, the officers woke Hardy up and began to question him as to whether he knew the individual they were looking for. 50-h Test. at 13-14; Am. Compl. ¶ 29. Hardy informed them that he did not know the man in the picture and told them that "it [was] obvious he [was] not in the room with [Hardy] because there [was] nowhere for him to hide." 50-h Test. at 14.

The officers subsequently asked Hardy his name, which he refused to provide. However, after officers saw Hardy's identification on the dresser, they took it out of the room, ran his name and found an alleged parole violation. Am. Compl. ¶ 30; 50-h Test. at 14. Upon returning to the room, they informed Hardy that he had an "active parole violation for absconding" and arrested him. 50-h Test at 14, 16.

Hardy now asserts that his arrest was improper because the alleged parole violation was in error. Although Hardy had previously served a four-year sentence for robbery and had been released in 2006, Hardy contends that he was never properly sentenced to parole for that offense. Am. Compl. ¶ 31; 50-h Test. at 12-16. When asked during his 50-h Testimony whether he was on parole, Hardy responded that "[a]ccording to the State of

New York, [he] was on parole," but also stated that he personally did not think he was on parole.[3] 50-h Test. at 14.

Hardy concedes that his previous arrest and incarceration for robbery would typically give rise to a term of parole.[4] 50-h Test. at 15. Further, Hardy has clarified that he was in fact subject to a term of Post Release Supervision ("PRS"), which was administratively imposed by NYS DOCS. Pl.'s Aff. Opp'n Defs.' Mot. Dismiss at 16-17. However, the Second Circuit and the New York Court of Appeals have since held that the administrative imposition of PRS is improper. See Earley v. Murray, 451 F.3d 71, 75-76 (2d Cir. 2006); People v. Sparber, 10 N.Y.3d 457, 859

---

[3] To clarify this position, during Hardy's 50-h Testimony his counsel referenced "a huge class-action lawsuit with a number of individuals that weren't duly sentenced to parole, [Hardy] being one of them." 50-h Test. at 12-13. Hardy has provided no further information regarding the disposition of this class-action lawsuit, but judicial notice is taken of a recent lawsuit that Hardy filed, along with several other individuals, in the Southern District of New York. See Hardy v. Fischer, No. 08-CV-2460, --- F.Supp.2d ----, 2010 WL 1325368 (S.D.N.Y. Mar. 31, 2010); Hardy v. Fischer, No. 08-CV-2460, 08-CV-9634, 07-CV-7790, --- F.Supp.2d ----, 2010 WL 1325145 (S.D.N.Y. Mar. 31, 2010). The gravamen of Hardy's SDNY complaint was that the administrative imposition of a Post Release Supervision ("PRS") term by NYS DOCS, as opposed to imposition by his sentencing judge, violated his due process rights. Hardy v. Fischer, 2010 WL 1325145, at *1.

[4] Specifically, when asked if he had "ever been arrested so that [he] would be on parole," Hardy responded, "[y]es, I served four years in prison. . . ." 50-h Test. at 15. Since New York passed "Jenna's Law," N.Y. Penal Law § 70.45(1), in 1998, certain violent felonies – including robbery – require the imposition of PRS. See Scott v. Fischer, 09-CV-1451, --- F.3d ----, 2010 WL 2991085, at *1 (2d Cir. Aug. 2, 2010).

N.Y.S.2d 582, 889 N.E.2d 259 (2008); <u>Garner v. N.Y. Dep't Of Corr. Servs.</u>, 10 N.Y.3d 358, 362, 859 N.Y.S.2d 590, 889 N.E.2d 467, 470 (2008).  Seizing on this fact, Hardy believes that because the method through which he was sentenced to PRS is no longer valid, he could not have violated his PRS term, and thus any arrest and incarceration for such a violation was improper. Nevertheless, he admitted in his 50-H Testimony that "[a]s it stands, the parole violation is a valid parole violation, as it stands currently."  50-h Test. at 20.

After his arrest on October 15, 2007, Hardy had a hearing before a judge at Riker's Island sometime in mid-November and was sentenced to a ninety-day program as a result of his parole violation.  <u>Id.</u> at 20-22.  It was while awaiting this sentencing and then serving this sentence that Hardy's claims regarding deliberate indifference to his medical condition arose, as explained below.

## b. Rikers Island

After his arrest on October 15, Hardy was taken to Otis Bantum Correctional Center ("OBCC"), a facility on Rikers Island.  There, Hardy was "processed and taken to medical intake as are all prisoners who initially arrive at Rikers Island." Am. Compl. ¶ 32-33; 50-h Test. at 17.  Hardy claims that he explained to staff, including defendants Officer Dorvil and Dr.

Medard, that he was experiencing extreme ear pain and dizziness and had a follow-up appointment scheduled at Woodhull.[5] Am. Compl. ¶ 34.  According to Hardy's complaint, defendants, including Officer Dorvil and Dr. Medard, "told him he was fine and sent him into lockup." Id. ¶ 35.

However, the record contradicts Hardy's claims that Rikers Island intake staff completely ignored his medical issue. Specifically, Hardy's "Intake History and Physical Exam" form from October 15 indicates that medical staff noted Hardy's ear problem and placed him on oral medication, which pharmacy records show was Amoxicillin.  Decl. Laura A. Del Vecchio Supp. Def.'s Mot. Dismiss ("Del Vecchio Decl."), Ex. I at NYC6-9; Del Vecchio Decl., Ex. J at NYC66.

Moreover, the evidence indicates that the named individual City defendants played limited roles.  Officer Dorvil appears to have completed certain forms relating to Hardy at intake, including a discharge planning questionnaire and a suicide prevention screening form.  Del Vecchio Decl., Ex. I at NYC45-46.  The latter form seems to indicate that Hardy was not referred to the medical unit by Officer Dorvil at the time it was completed.  Id. at NYC46.  Dr. Medard, on the other hand, appears to have been entirely absent from Hardy's intake.  Dr.

_____

[5] Hardy also testified that he requested that staff contact the Woodhull ENT specialist, but that Rikers Island staff did not do so.  50-h Test. at 17-18.

Medard has submitted a declaration stating that in 2007, he did not work at OBCC or conduct intake evaluations at Rikers Island. Del Vecchio Decl., Ex. K. Instead, Dr. Medard explains that at the time of Hardy's arrest he was employed at the medical clinic at George Motchan Detention Center ("GMDC"),[6] a separate facility on Rikers Island. Id. Thus, according to Dr. Medard, the only way inmates could come into contact with him would be by scheduling a sick call. Id.

Although the circumstances of the transfer are not made clear, at some point in mid-October Hardy was transferred to GMDC. There, he had a follow-up appointment for evaluation of otitis media (ear infection or swelling of the middle ear) on October 25, 2007. Del Vecchio Decl., Ex. I at NYC14-15. Notes from the October 25 evaluation[7] state that Hardy claimed his ear felt much better and that he denied swelling, painful cervical lymph nodes, discharge or pain. Id. at NYC14. The examination

---

[6] Pharmacy orders corroborate that Dr. Medard was a physician at GMDC as of November 5, 2007. See Del Vecchio Decl., Ex. I at NYC33. Dr. Medard suggests that once Hardy received medical files from counsel for City defendants, Hardy seized upon Dr. Medard's name to include him — improperly — among intake personnel. See Mem. Supp. Def. Medard's Mot. Dismiss ("Medard Mem. Supp.") at 3-4. Hardy's affirmation in opposition to defendants' motion to dismiss does not reiterate his claim that Dr. Medard was among intake personnel; instead, it states more generally that Dr. Medard was one of the "gate keepers" who prevented Hardy from receiving adequate medical care.

[7] These October 25 progress notes are stamped by Joseph Thomas, MD and Terry Gravesande, PRA-C.

of Hardy's left ear showed no erythema (redness) or cerumen (earwax). Id. No treatment was indicated and no follow-up was scheduled. Id. As this medical visit was ten days after intake, it would have taken place toward the end of the course of antibiotics that were prescribed to Hardy during intake. See Del Vecchio Decl., Ex. J. at NYC66-67.

Although it is unclear what prompted the visit, approximately ten days later, on November 5, 2007, Hardy was seen by defendant Dr. Medard. Del Vecchio Decl., Ex. I at NYC13. Dr. Medard, an internist, claims that this was the only time that he saw Hardy. This claim is supported by the medical records that relate to Dr. Medard, all of which bear the date November 5. See Del Vecchio Decl., Ex. I at NYC13, 21, 33, 36. At this November 5 appointment, Hardy told Dr. Medard that he had been diagnosed with a perforated tympanic membrane (ear drum) and had been given antibiotic drops prior to his arrest. Id. at NYC13. Hardy complained to Dr. Medard of pain and decreased hearing in his left ear and stated that he could "feel it draining." Id. After examining Hardy,[8] Dr. Medard noted that Hardy had left otitis media. Id. He prescribed another course of antibiotics and placed orders for Augmentin and Cortisporin

_____

[8] Examination of the ear showed that the left auditory canal was hyperemic (increased blood flow) with exudate (fluid); the tympanic membrane was non-bulging, red and no perforation was noted. Del Vecchio Decl., Ex. I at NYC13.

ear drops.[9] Id. at NYC13, 33.  He also referred Hardy to an ENT.

Id. at NYC13, 21.  It is unclear for what date this ENT

appointment was originally requested, but Hardy's complaint

contends that it was only after a fainting spell a few weeks

later that he was finally permitted to see an on-site ENT.  Am.

Compl. ¶ 36.

An On-Island Specialty Clinic form indicates that Hardy saw

the on-site ENT on November 15, 2007.[10]  Del Vecchio Decl., Ex. I

at NYC22.  Hardy testified that at the time of this appointment

he had swelling in his neck about "the size of a small golf

ball."  50-h Test. at 19.  The ENT placed an order for

Cortisporin and Ciprofloxacin ("Cipro").  Del Vecchio Decl., Ex.

I at NYC23.  Hardy received these prescriptions, but claims they

were ineffective.  50-h Test. at 19; Am. Compl. ¶ 39.[11]  Although

---

[9] Rikers Island pharmacy records indicate that Hardy received
these prescriptions on November 7, 2007.  Del Vecchio Decl., Ex.
J at 67.

[10] The form further indicates that Hardy complained to the ENT
that he "hurt ear drum with Qtip [sic]" and that there was
damage to the tympanic membrane.  Del Vecchio Decl., Ex. I at
NYC21.

[11] It appears that Hardy's use of these medications may have been
interrupted.  A progress note dated November 17, 2007 indicates
that Hardy told attending staff that "DOC searched his cell
[that] morning and threw away his ear drops."  Del Vecchio
Decl., Ex. I at NYC10.  The note further indicates minimal
redness and minimal exudate and that another order for
Cortisporin ear drops would be placed.  Id.  A pharmacy order
for Cortisporin bears a start date of November 17, 2007, id. at
NYC31, but it is unclear when that order was processed by the

an order was written for a follow-up appointment in two weeks time with the ENT, Del Vecchio Decl., Ex. I at NYC24, Hardy would miss this appointment because of his subsequent transfer to Downstate Correctional Facility ("Downstate"). See Am. Compl. ¶¶ 38, 40; see also 50-h Test. at 22-23 (explaining that Hardy's request for a medical hold to delay transfer was denied).

Hardy claims, and defendants' papers do not dispute, that this November visit to the on-site ENT was the only time Hardy was treated by an ENT during his time on Rikers Island. 50-h Test. at 33. Hardy contends that over the four- to five-week period spanning from his arrival at OBCC on October 15, 2007 until he finally saw this on-site ENT in mid-November,[12] the only treatment he received was several appointments with "typical Rikers Island medical staff [who] told [him] there was nothing wrong with [him]." 50-h Test. at 18.

**c. Downstate**

Hardy was transferred to Downstate on or about November 27, 2007. See Decl. Wesley E. Bauman Supp. Defs.' Mot. Dismiss

pharmacy or received by Hardy. See Del Vecchio Decl., Ex. J at NYC66-67.

[12] Hardy remembered seeing the on-site ENT on or about November 20, 2007, 50-h Test. at 19, but medical records suggest that this appointment took place on November 15, 2007. See Del Vecchio Decl., Ex. I at NYC22.

("Bauman Decl."), Ex. B at MED 099. Hardy testified that throughout medical intake processing at Downstate, he was experiencing extreme pain, blurred vision, discharge from his left ear, hearing loss and increased swelling in his neck, "noticeable to the naked eye." 50-h Test. at 23; see also Am. Compl. ¶ 40. Hardy contends he "literally begged" the medical staff at Downstate to send him to a specialist. 50-h Test. at 23. However, the correction officer at the medical intake area and defendant P.A. Noriel DeGuzman allegedly denied Hardy's request, stating that Downstate was a transit facility and that the issue would be addressed at Hardy's permanent jail. Id. at 25; Am. Compl. ¶¶ 41-42.

Downstate medical records show that staff was aware of Hardy's ear problem. See, e.g., Bauman Decl., Ex. B at MED 006 (stating on an undated inquiry and response form that Hardy had a current hearing problem and a current health problem described as a "ruptured L eardrum since 10/07"); see also id. at MED 099, 100. However, whether any action was taken at Downstate to address the issue is far from clear. Hardy appears to have undergone a standard medical evaluation,[13] and was then sent to the general population of the facility without referral to a

---

[13] Hardy apparently underwent a chest x-ray with normal results, Bauman Decl., Ex. B at MED 033, and a laboratory test report with a date received of November 28, 2007 includes a stamp indicating "no action is required at this time." Id. at MED 30.

physician.  See id. at MED 007.  No on-going or newly-prescribed medications are indicated on the forms.[14]  See, e.g., id. at MED 100; see also Del Vecchio Decl., Ex. I at NYC27.

Hardy remained at Downstate until at least December 4, 2007, after which he was transferred to Willard Drug Treatment Campus ("Willard").  Bauman Decl., Ex. C at MED 002.  No further evidence has been submitted that would indicate that Hardy received any medical attention for his ear at Downstate.[15]

**d. Willard**

Upon arrival at Willard on or about December 5, 2007, Hardy was processed through medical intake by staff, including defendants Willard Correction Officers and Nurse Dalecki.  Am. Compl. ¶¶ 43-44.  Hardy claims that at this point his vision and hearing were dramatically reduced, he had difficulty walking and standing, the swelling in his neck was about the size of a tennis ball and puss was emanating from his ear in a constant

---

[14]  The course of medication prescribed by the on-site ENT at Rikers Island was due to end on November 25, 2007, see Del Vecchio Decl., Ex. J at NYC66, so would not necessarily have appeared on the Downstate intake forms.

[15] A progress note dated November 28 is barely legible, but seems to state "L ear - declined [X] test."  Pl.'s Ex. D at 192.  The note following underneath, dated December 3, 2007, includes only a stamp with the option for "no action required at this time" marked off.  Id.

flow.[16]  Id.; 50-h Test. at 25-26.  These claims are not in

conflict with the State's health records, which include

handwritten progress notes indicating that on the day following

Hardy's arrival at Willard, Hardy complained that his ear was in

"excruciating pain" and that it was "draining green/yellow."

Bauman Decl., Ex. C at MED 023.  The notes indicate that Hardy

had a wad of toilet paper in his ear and that when he removed

the paper, "cream colored drainage" appeared.  Id.

Intake notes indicate that Nurse Dalecki was involved in

Hardy's Willard intake.  The Willard "Intake Summary" form,

dated December 5, 2007, lists a possible ruptured ear drum as a

current health problem and appears to be signed by Nurse

Dalecki.  Id. at MED 002.  The form describes Hardy's past

prescriptions for Cipro and Cortisporin, but it is unclear

whether any medication was ordered for Hardy at that time.  See

id.  An appointment for evaluation of Hardy's ear was set for

December 6, 2007.  Id. at MED 002, 023.

_____

[16] To controvert Hardy's claimed difficulties in walking and
standing, state defendants point out records indicating that
while at Willard Hardy may have been employed as a Forest Worker
III and was enrolled as a student in the masonry shop.  See
Bauman Decl., Ex. D.  It is unclear from those records when
Hardy actually reported to work.  Willard Physical Limitations
Permits indicate that on December 5, no physical limitations
were noted, Pl.'s Ex. D at 259; on December 11, no physical
training was permitted for the day, id. at 258; and on December
21, no physical training was permitted until January 21, id. at
255.

Hardy acknowledges that he was frequently seen by nurse practitioners at Willard. 50-h Test. at 26 (testifying that he "literally was in the medical untit [sic] there at least four days out of the week every single week"); see also Am. Compl. ¶ 45. State progress notes indicate that Hardy was evaluated by Willard's medical staff on December 6, 10, 11 and 17. Bauman Decl., Ex. C at MED 020-022. Over this period of time, from December 6 through December 17, 2007, progress notes indicate that Hardy received some treatment for left otitis media, perforation and mastoiditis. See id. at MED 020-022.

Specifically, Hardy appears to have had an ear culture on December 6, 2007. Id. at MED 029. A December 6 progress note reports "copious yellow discharge from [Hardy's] ear canal" and an evaluation of left otitis media and perforation. Id. at MED 022. The note lists various medications and a follow-up appointment scheduled for December 13, 2007. Id. Notes further indicate that on December 10, Hardy complained of increased pressure and dizziness and that drainage, some of which may have been bloody, was observed. Id. at MED 021. Hardy was instructed to take his medication as directed and the future December 13, 2007 appointment was again noted. Id. Hardy was back the following day, December 11, 2007, complaining of increased discomfort. Id. The corresponding progress note indicates that the December 13 appointment was moved up to that

same day, December 11.  Id.  The subsequent note, also dated December 11, goes on to state that Hardy was experiencing continued pain; copious yellow drainage and possibly an odor were observed.  Id.  A thirty-day supply of Cipro, an issuance of cotton balls, an otolaryngology ("OTO") referral and an order for a CT Scan were provided for Hardy at this time.  Id.  The OTO referral was made with the urgency of care marked "Soon" (which the form defines as "14 DAYS") as opposed to "Emergency" ("24 HOURS") or "Urgent" ("5 DAYS").  Id. at MED 067.  Hardy claims he was promised that he could see an ENT when one was available, Am. Compl. ¶ 46, but that he was never treated by an ENT on-site at Willard.  50-h Test. at 27.

On December 17, 2007, Hardy returned to the infirmary complaining of pain and dizziness and stated, "I need to go to a hospital."  Bauman Decl., Ex. C at MED 020.  Progress notes from that date indicate "copious" and "chronic" drainage.  Id.  Hardy explained to staff that he had not been taking his Cipro as directed because the information sheet stated not to take it in combination with his other medication; staff directed Hardy to begin his course of Cipro as previously ordered.  Id.  Staff also noted that Hardy's ear culture revealed "no growth."  Id. at MED 020, 029.  No follow-up appointment appears to have been

scheduled,[17] see id., but, as mentioned supra, an OTO referral

had already been made on December 11.  Id. at MED 067.

Two days later, a progress note dated December 19, 2007

indicates that staff received a call from Hardy's mother

regarding Hardy's ear problems.[18]  Id. at MED 020.  Hardy claims

that his mother called the facility threatening to take legal

action, which was what prompted officials to allow Hardy finally

to see a specialist.  Am. Compl. ¶ 46.

On December 21, 2007, ten days after the initial OTO

referral was made, Hardy was seen by defendant Dr. Pathak

(presumably an otolaryngologist).  Bauman Decl., Ex. C at MED

067.  Although the paperwork from this appointment does not

specify where it took place, and State defendants have provided

no additional information regarding Dr. Pathak, Hardy recalled

an appointment outside of the facility on or about December 18,

2007, with a doctor retained by Willard.  See Am. Compl. ¶ 46.

Dr. Pathak's handwritten notes from this appointment restate

Hardy's symptoms of constant drainage, pressure, pain and

minimal hearing.  Bauman Decl., Ex. C at MED 067.  Hardy

recalled that the doctor drained puss from an abnormally large

abscess in the back of Hardy's head and scheduled an operation

---

[17] A few of the accompanying handwritten notes are
indecipherable.

[18] Accompanying handwritten notes are unclear.

for January 3, 2008.  Am. Compl. ¶ 47; Bauman Decl., Ex. C at

MED 044, 034.  Dr. Pathak's orders included a course of Cipro

until time of surgery, a CT scan "ASAP" and a mastoidectomy

needed "soon" to relieve the abscess.  Bauman Decl., Ex. C at

MED 067; see also 50-h Test. at 28 (stating that the doctor

"made it very clear [Hardy] was going to need an operation to

correct the problem because of the severity of it as a direct

result of it going untreated for almost two months at that

point").

    Treatment records from December 21 onward give the

impression that Dr. Pathak was, to at least some extent,

responsible for Hardy's care during the remainder of his

sentence at Willard.  See, e.g., Bauman Decl., Ex. C at MED 034,

044, 048.  However, a different physician appears to have signed

the "Request" portion of a "Request and Report of Consultation"

form filled out on either December 25 or December 28, 2007,[19]

which requests a consultation for Hardy with the urgency of care

marked "Emergency."  Id. at MED 038 (the "Consult Requested By:"

line appears to say "Dr. Graceffo/To A. Dalecki").  It appears

that it was only after this "emergency" request that Hardy was

finally taken to Cayuga Medical Facility ("Cayuga") for the CAT

scan that Dr. Pathak ordered "ASAP" on December 21.  Id.  There

is no documentation from the time period between December 21,

---

[19] The handwritten date is difficult to decipher.

19

when Hardy was first examined by Dr. Pathak, and December 25/28, when the new "emergency" request was made, to indicate what prompted this emergency request from Dr. Graceffo.

On December 28, 2007, Hardy was taken to Cayuga, where he had a CT scan. Id.; Pl.'s Ex. D at 224. Hardy claims that the Cayuga radiologist told prison officials that Hardy "needed emergency surgery because the infection was life threatening." Am. Compl. ¶ 48; see also 50-h Test. at 28-29 (explaining that the radiologist called Willard and told officials to bring Hardy back to the hospital to be admitted for emergency surgery). Hardy's claims are in part corroborated by the December 28 DOCS "Consultant Report," where a doctor whose name is illegible noted that after the CT scan, which was done "for pre-surgical planning," the radiologist called the medical office at Willard and suggested a transfer. Bauman Decl., Ex. C at MED 038. The notes go on to state that the writer spoke to Dr. Pathak and another doctor, that the "CT results [were] not unexpected," that Hardy should continue taking his Cipro and that surgery would be conducted as previously arranged. Id.

State defendants believe that Hardy's claim of a "life threatening" condition is contradicted by the December 28 report from the radiology center at Cayuga, which states "[t]he patient should be evaluated for timely surgical evacuation." Id. at MED 039. However, Cayuga staff also indicated that Hardy should

return earlier "if fever, chills, increased pain otherwise follow up with Dr. Pathak as previously arranged." Id. at MED 061. In spite of this instruction, it appears that Hardy was running a fever of 100.3 degrees at the time of his discharge from Cayuga. Pl.'s Ex. D at 35. It is not clear whether this fever persisted in the coming days, as there is no documentation for the period between Hardy's December 28 visit to Cayuga and his January 3 operation.

Although there are no medical records that confirm a December 29 visit to Cayuga, Hardy claims that the following day, more tests were run at Cayuga Medical Facility. Am. Compl. ¶ 49; 50-h Test. at 29. Hardy claims that "[u]nbelievably, the doctor retained by Willard DTC, upon information and belief Kamal Pathak, M.D., ordered [Hardy] back to prison because he already had a surgery date scheduled even though the Cayuga radiologist explained that [Hardy's] life was in danger." Am. Compl. ¶ 50.

Hardy, therefore, remained at Willard awaiting his scheduled surgery. Hardy claims that in the days preceding the scheduled surgery he "passed in and out of consciousness and was unable to eat, see, or hear." Am. Compl. ¶ 51. As noted above, no medical records exist to indicate that Hardy's condition was monitored by Willard staff during this period.

A mastoidectomy was performed on January 3, 2008,
apparently by Dr. Pathak.  See Bauman Decl., Ex. C at MED 048
(noting, post-surgery, a chronic mastoid abscess causing a
Bezold's abscess); Am. Compl. ¶ 52 (claiming that surgery was
performed by Dr. Pathak at Cayuga).  Hardy was admitted to
Willard's infirmary after the operation and was scheduled to
remain there until January 7, 2008.  See Pl.'s Ex. D at 241; see
also 50-h Test. at 31 (testifying that staff kept him in the
facility infirmary for three days following the surgery).  Hardy
claims that upon his immediate return to Willard after the
surgery, defendants Willard Correction Officers "refused him
follow-up treatment or appointments with the doctor," Am. Compl.
¶ 53, which Hardy requested daily.  50-h Test. at 36.  However,
state records indicate that a consultation with an ENT
specialist was requested on January 4, 2008 and scheduled for
January 15, 2008.  See Bauman Decl., Ex. C at MED 048.  A
progress report from January 8 notes swelling in the mastoid
area, but observes that Hardy stated he was no longer having any
pain and was feeling much better.  Pl.'s Ex. D at 246.  A
consultation with defendant Dr. Pathak was held on January 14,
2008, at which point it was noted that most of Hardy's ear pain
had subsided, ear drainage had decreased significantly and the
ear canal was visible, although there seems to have been

continued swelling.  See Bauman Decl., Ex. C at MED 048.

"Satisfactory progress" was indicated.  Id.

Unfortunately, though, Hardy's condition appears to have again deteriorated significantly between this time and the time of his release from Willard on March 11, 2008.  Hardy testified that, despite continued use of oral antibiotics after the operation, in the following weeks his hearing only worsened and he developed a staph infection from unsanitary post-operation care.  50-h Test. at 31, 36; see also Am. Compl. ¶ 54.  Medical records appear to confirm that two ear cultures taken in February 2008 found the existence of some staphylococcus.[20] According to Hardy, this staph infection caused significant puss build-up in his face, which Willard staff allowed to fester there for months.  50-h Test. at 39.  Although requesting treatment daily, Hardy claims to have been given nothing more than "Motrin and a Band-Aid."  50-H Test. at 36, 39.  Treatment notes from January and February are in conflict with Hardy's claim to have received nothing more than Motrin, but repeatedly

<hr>

[20] Specifically, a laboratory report for a left ear culture has a collection date of February 19, 2008 and states "moderate growth of coagulase negative staphylococcus."  Bauman Decl., Ex. C at MED 028.  The stamp on the form indicates that follow up would be arranged with a specialist.  Id.  Another culture report dated February 29, 2008 indicates a "few colonies of coagulase negative staphylococcus" and a stamp on that report dated March 3, 2008 again indicates that follow up would be arranged with a specialist.  Id. at MED 027.

acknowledge that Hardy continued to experience symptoms of drainage, swelling, pressure and pain, which were treated – apparently ineffectively – with antibiotics.  Pl.'s Ex. D at 178-85; Bauman Decl., Ex. C at MED 044.

More specifically, progress notes from appointments at the infirmary on January 22, 2008, and again on January 29, 2008, indicate that Hardy was complaining of thick yellowish drainage and swelling in his left ear.  Pl.'s Ex. D at 182-83.  An appointment was scheduled for February 1, 2008 at which Hardy complained of head pain, dizziness and pressure over his left eye.  Pl.'s Ex. D at 182.  Copious yellow drainage was observed. Id.  A report by Dr. Pathak, dated February 5, 2008, notes continued drainage, pressure and pain, that the abscess was still present and that if there was no improvement within two weeks, another CT scan should be run.  Bauman Decl., Ex. C at MED 044.  Hardy continued to be treated with antibiotics.  Id. A follow-up appointment was requested on February 6, 2008 to be scheduled in 30 days time.  Id. at MED 034.

It appears that Hardy had an additional CT scan at Cayuga on February 25, 2008, which indicated continued "extensive left mastoid sinus mucosal inflammatory disease."  Id. at MED 041-042.  Progress notes from around this time, dated February 14, 19, 24, 25, 27, 28 and 29, as well as March 3 and 4, 2008, report that Hardy was continuing to experience drainage.  See

Pl.'s Ex. D at 178-81. One note from February 29, 2008
describes that the provider opened up the "area behind [left]
ear that [was] swollen and infected" and "drained [a] copious
am[ount] [of] purulent drainage," after which Hardy said his ear
felt "much better." Id. at 178. Other notes reference the
results of an ear culture, continued use of antibiotics and a
future appointment that had been scheduled with the ENT. Id. at
177.

During an ENT consultation on or about March 5, 2008, Dr.
Pathak noted renewed draining and continued swelling, concluding
that Hardy needed a revision of mastoidectomy for a persistent
left mastoid abscess. Bauman Decl., Ex. C at MED 034. A
medical form completed March 5, 2008, marked that Hardy "needs
outpatient care/medical follow-up within two weeks of release,"
Pl.'s Ex. D at 252, and Dr. Pathak's consultation notes from the
same day indicate an appointment Hardy scheduled at Manhattan
Eye and Ear ("MEE") hospital for April 14, 2008, following
Hardy's release. Bauman Decl., Ex. C at MED 034. A progress
note dated March 7, 2008 states "No med. emerg." Id. at 176.
The next and seemingly final note is a stamp from March 11,
2008, that reads "COMPLETED PROGRAM TODAY." Id.

**e. Post-Release**

On March 11, 2008, Hardy was released from custody. Am. Compl. ¶ 55. Hardy claims that he "first reported to his parole officer in order to avoid re-imprisonment." Id. The complaint states that on March 14, 2008, Hardy reported to MEE where he was admitted immediately and diagnosed with a life-threatening infection. Id. ¶ 56. However, medical records from the hospital indicate an admission date of March 17, 2008. Pl.'s Ex. D at 587. Hardy testified that at the time of his admission, the knot in his neck was gone, but his face was severely swollen and twelve ounces of puss had to be removed. 50-h Test. at 38; see also Am. Comp. ¶ 56 ("Puss was allowed to fester in his face for over 12 weeks.").

A letter from Dr. Vikas Mehta of MEE states that Hardy was hospitalized on-site from March 17, 2008 until March 28, 2008 for a severe infection. Pl.'s Ex. D at 560. The letter further indicates that Hardy would need four to six-weeks of "significant post operative care." Id. While at MEE, from March 14 to March 28, 2008, Hardy was placed on intravenous antibiotics and underwent two surgeries. Am. Compl. ¶ 57. When Hardy developed a secondary infection he was readmitted to MEE on April 16, 2008, and was again placed on intravenous antibiotics. Id. ¶ 58; 50-h Test. at 41.

Hardy was moved from MEE to Waterview Nursing on April 25, 2008, still suffering from acute mastoiditis.  Pl.'s Ex. D at 290.  Hardy remained on intravenous antibiotics for an additional eight weeks and had one subsequent surgery to remove a drainage tube, with several future surgeries scheduled in order to repair the hearing in his left ear.  Am. Compl. ¶ 59; 50-h Test. at 42.  As of August 2008, Hardy reported that he was "deaf in [his] left ear as a direct result of the infection being in my head for so long, it ripped my ear canal apart." 50-h Test. at 42-43.

The medical records submitted with Hardy's opposing papers indicate the Hardy's treatment at Waterview Nursing ended on September 17, 2008.  See Pl.'s Ex D at 300.  However, Hardy's amended complaint, dated July 7, 2009, stated that he was a twenty-seven-year-old man still residing in a nursing home, who necessitated ongoing treatment for his injuries stemming from defendants' failure to afford him proper medical care.  Am. Compl. ¶ 60; see also 50-h Test. at 43.

## The Current Action

On January 15, 2009, Hardy commenced the instant action.[21]
On June 5, 2009, City defendants' counsel provided Hardy's
counsel with medical records from Hardy's time at Rikers Island.
About one month later, on July 7, 2009, Hardy filed an amended
complaint naming additional defendants. A copy of the
transcript from Hardy's 50-h testimony is annexed to Hardy's
amended complaint. All defendants have now moved to dismiss
Hardy's complaint, or, in the alternative, for summary judgment,
on various theories.

Dr. Medard moves to dismiss Hardy's § 1983 claims against
him, arguing that (1) the acts alleged do not rise to the level
of deliberate indifference to Hardy's medical needs; and
(2) even if the allegations are sufficient, the records of
Hardy's treatment at Rikers Island contradict Hardy's claims, as
they demonstrate that on the one occasion that defendant Dr.
Medard saw Hardy, he appropriately attended to Hardy's medical
needs. City defendants argue that (1) Hardy's false arrest and

---

[21] On March 9, 2009, Hardy also filed a related complaint in New
York State Supreme Court, Bronx County, against many of the same
defendants, alleging negligence and medical malpractice stemming
from medical treatment over the same period of time which is at
issue in this case. Counsel for Dr. Medard notes that "[t]here
is a Motion to Dismiss the state court action, or in the
alternative stay the action pending resolution of the instant
case, currently pending in the New York State Supreme Court,
Bronx County." Medard Mem. Supp. at 3 n.3.

malicious prosecution claims are barred by <u>Heck v. Humphrey</u>, 512 U.S. 477 (1994), because Hardy has not established that his parole revocation has been invalidated; (2) Hardy fails to set forth the proper elements for a municipal liability claim and fails to allege a facially plausible claim under 42 U.S.C. § 1983; (3) pursuant to the New York City Charter, NYCDOC is not an entity subject to suit; and (4) the allegations are not sufficient to maintain a claim for deliberate indifference.

State defendants present similar arguments to City defendants, and add arguments that: (1) defendants are entitled to qualified immunity because Hardy's claims do not touch upon clearly established federal rights; (2) Hardy's claims against State defendants are barred by the Eleventh Amendment to the United States Constitution because the claims are made against defendants in their official capacities; and (3) regarding a request by Hardy for leave to include NYS DOCS as a defendant, any such request should be denied because DOCS is also immune from suit under 42 U.S.C. § 1983. Defendants also request that the court decline to exercise pendent jurisdiction over Hardy's state law claims.

As explained below, defendants' motions are granted in part and denied in part.

## Discussion

### (1)

### Abandonment of Certain Claims

At the outset, some of Hardy's claims will be deemed abandoned. Federal courts have the discretion to deem a claim abandoned "when a party moves for summary judgment on one ground and the party opposing summary judgment fails to address the argument in any way." <u>Taylor v. City of New York</u>, 269 F. Supp. 2d 68, 75 (E.D.N.Y. 2003); <u>see also</u> <u>Lipton v. Cnty. of Orange</u>, 315 F. Supp. 2d 434, 446 (S.D.N.Y. 2004) ("This Court may, and generally will, deem a claim abandoned when a plaintiff fails to respond to a defendant's arguments that the claim should be dismissed."). Here, Hardy's affirmation in opposition to defendants' motions to dismiss addresses only Hardy's claims for: (1) deliberate indifference to Hardy's serious medical condition pursuant to 42 U.S.C. § 1983, (2) false arrest,[22] (3) malicious prosecution and (4) municipal liability.

Absent from Hardy's papers is any mention of his claims that: (1) police and correction officers assaulted and battered

---

[22] It seems that at one point Hardy may have decided not to include a false arrest claim as part of this federal action. <u>See</u> 50-h Test. at 15 ("He was taken into incarceration we're saying wrongfully, that's a different issue, we're not claiming that here. The civil rights violation we have here essentially is regarding denial of medical treatment."). However, Hardy's opposing papers maintain that he has stated a claim for false arrest, and, accordingly, Hardy's argument is considered <u>infra</u>.

him, Am. Compl. ¶ 68, (2) defendants were negligent in their hiring, retention and training of employees, id. ¶ 75, or (3) defendants, "motivated in part by racial and/or ethnic animus, conspired to deprived [sic] plaintiff of his federal civil and constitutional rights," id. ¶ 79. Moreover, no facts that might form a basis for these claims can be found anywhere in Hardy's complaint. Accordingly, although Hardy's failure to respond to defendant's arguments might not compel abandonment on its own, the fact that these claims are entirely unsupported makes a finding of abandonment particularly appropriate. Thus, Hardy's claims of assault and battery; negligent hiring, retention and training; and conspiracy to deprive plaintiff of his civil rights under 42 U.S.C. § 1985 are deemed abandoned.

**(2)**

### Conversion of Motions and Governing Standards

Although defendants have moved to dismiss under Rule 12(b)(6), consideration of the voluminous evidence submitted by both sides requires conversion of at least portions of defendants' motions into motions for summary judgment. See Fed. R. Civ. P. 12(d); see also Gurary v. Winehouse, 190 F.3d 37, 43 (2d Cir. 1999). Both sides have submitted medical records that speak to Hardy's claims of deliberate indifference to his serious medical condition. Accordingly, defendants' motions to

dismiss this claim and any claim for municipal liability based upon deliberate indifference will be converted into motions for summary judgment.  Cf. In re G. & A. Books, Inc., 770 F.2d 288, 295 (2d Cir. 1985) (explaining that conversion is appropriate where non-moving party "should reasonably have recognized the possibility that the motion might be converted into one for summary judgment"); Zynger v. Dep't Homeland Sec., 615 F. Supp. 2d 50, 59 n.9 (E.D.N.Y. 2009) ("Where a party has submitted evidence outside the complaint, that factor weighs in favor of that party having had sufficient notice that a motion to dismiss might be converted into a motion for summary judgment . . . ."), aff'd, No. 09-CV-2478, 2010 WL 1170348 (2d Cir. Mar. 25, 2010). However, as no party has submitted any evidence that might speak to Hardy's claims of false arrest or malicious prosecution, the plausibility of these claims is determined on the pleadings alone.

When evaluating a motion to dismiss for failure to state a claim under Rule 12(b)(6), a court shall "construe plaintiff['s] complaint liberally, accepting all factual allegations in the complaint as true, and drawing all reasonable inferences in plaintiff['s] favor." Selevan v. N.Y. Thruway Auth., 584 F.3d 82, 88 (2d Cir. 2009).  To survive a motion to dismiss, a complaint must state a claim to relief that is "plausible on its face." Bell Atl. v. Twombly, 550 U.S. 544, 570 (2007).

"[L]egal conclusions and threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." <u>Harris v. Mills</u>, 572 F.3d 66, 72 (2d Cir. 2009) (quoting <u>Ashcroft v. Iqbal</u>, --- U.S. ---, 129 S. Ct. 1937, 1949 (2009)) (internal quotation marks and alterations omitted).

Summary judgment should be granted "if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c).  When deciding the motion, a court must "resolve all ambiguities and draw all factual inferences in favor of the nonmoving party." <u>McClellan v. Smith</u>, 439 F.3d 137, 144 (2d Cir. 2006).  Summary judgment cannot be granted "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 248 (1986).

### (3)

### Hardy's Claims Against State Defendants and NYCDOC

As State defendants note in their moving papers, Hardy's complaint does not specify whether damages are sought against defendants in their individual or official capacities.  Hardy's complaint is, therefore, construed to assert claims against defendants in both capacities.  <u>See</u> <u>Oliver Schools, Inc. v.</u>

_Foley_, 930 F.2d 248, 252 (2d Cir. 1991) ("[A] complaint's failure to specify that claims against state officials are asserted against them in their individual capacities does not justify an outright dismissal . . . .").

Insofar as Hardy asserts § 1983 claims for damages against State defendants in their official capacities, those claims are barred by the Eleventh Amendment and are therefore dismissed. _See, e.g._, _Davis v. New York_, 316 F.3d 93, 101 (2d Cir. 2002) (explaining that claims against employees of NYS DOCS in their official capacities are barred by the Eleventh Amendment). For the same reason, Hardy's request to further amend his complaint to add NYS DOCS as a defendant is denied. _See id._ (dismissing claims against NYS DOCS as barred by the Eleventh Amendment); _Santiago v. N.Y. Dep't of Corr. Servs._, 945 F.2d 25, 28 n.1 (2d Cir. 1991) (noting that NYS DOCS, as an agency of the state, is entitled to assert Eleventh Amendment immunity against a claim for damages). In contrast, Hardy's claims against State defendants in their individual or personal capacities are not barred by the Eleventh Amendment and are considered _infra_. _See_ _Farid v. Smith_, 850 F.2d 917, 921 (2d Cir. 1988).

Hardy's claims against NYCDOC must also be dismissed. As an agency of the City, NYCDOC is not a suable entity. _See, e.g._, _Abreu v. City of New York_, 657 F. Supp. 2d 357, 361 (E.D.N.Y. 2009) ("All actions and proceedings for the recovery

34

of penalties for the violation of any law shall be brought in the name of the City of New York and not in that of any agency, except where otherwise provided by law." (quoting N.Y. City Charter, Ch. 17, § 396) (internal alteration omitted)); see also Mobley v. Ogara, No. 02-CV-6605, 2006 WL 197185, at *7 (E.D.N.Y. Jan. 23, 2006) ("It is well established that the [NYC]DOC is a non-suable entity.").

## (4)

### Deliberate Indifference

Hardy's primary claim is a claim of deliberate indifference, brought under 42 U.S.C. § 1983, against the City, Officer Dorvil, Dr. Medard, P.A. Noriel DeGuzman, the Willard Correction Officers, Nurse Dalecki and Dr. Pathak, as well as unnamed employees of NYCDOC and NYS DOCS. Although Hardy asserts only a violation of his due process rights under the Fourteenth Amendment, his claims against State defendants, which arose post-conviction, are properly brought under the Eighth Amendment's prohibition of "cruel and unusual punishment." See Caiozzo v. Koreman, 581 F.3d 63, 69 (2d Cir. 2009) (explaining that the Eighth Amendment forms the basis of a convicted prisoner's claim of deliberate indifference to his medical needs, whereas the Fourteenth Amendment protects a state prisoner from deliberate indifference pre-conviction).

Accordingly, Hardy's claims against State defendants will be construed as alleging an Eighth Amendment violation.  In any event, "the same standard [applies] irrespective of whether [plaintiff's claims] are brought under the Eighth or Fourteenth Amendment."  Id. at 72.

To successfully claim deliberate indifference, a plaintiff must show: (1) that he had a "serious medical condition"; and (2) that it was met with "deliberate indifference."  Id. (quoting Cuoco v. Moritsugu, 222 F.3d 99, 106 (2d Cir. 2000)). The first element — a serious medical condition — is objective. Salahuddin v. Goord, 467 F.3d 263, 279 (2d Cir. 2006).  This objective determination differs, however, depending on whether a prisoner alleges that he received no treatment, or simply inadequate treatment.  When prison officials failed to provide any treatment, a court simply examines the inmate's medical condition, standing alone and in the abstract, to determine if it is "sufficiently serious."  Id.  The "sufficiently serious" standard "contemplates a condition of urgency, one that may produce death, degeneration, or extreme pain."  Hathaway v. Coughlin, 99 F.3d 550, 553 (2d Cir. 1994) (internal quotations and citations omitted).  However, a plaintiff is not required to show that he "experiences pain that is at the limit of human ability to bear, nor [must he show] that [his] condition will degenerate into a life-threatening one."  Brock v. Wright, 315

F.3d 158, 163 (2d Cir. 2003).  Relevant factors "include whether 'a reasonable doctor or patient would find [the condition] important and worthy of comment,' whether the condition 'significantly affects an individual's daily activities,' and whether it causes 'chronic and substantial pain.'"  Salahuddin, 467 F.3d at 280.

On the other hand, when a prisoner receives some care, but allegedly inadequate care, the analysis of whether there was a sufficiently serious medical condition is more complex.  In this situation, the court must focus on whether "the alleged deprivation of adequate medical care [was] sufficiently serious."  Id. (emphasis added and internal quotation marks omitted).  "For example, if the prisoner is receiving on-going treatment and the offending conduct is an unreasonable delay or interruption in that treatment, the seriousness inquiry 'focus[es] on the challenged delay or interruption in treatment rather than the prisoner's underlying medical condition alone.'"  Id. (alteration in original).  In effect, a court must determine "whether the inadequacy in medical care [was] sufficiently serious" by examining the harm plaintiff was exposed to as a result of defendant's conduct.  Id. at 280.

The second element – deliberate indifference – is subjective, and asks whether the charged official acted "with a sufficiently culpable state of mind."  Id.  On a motion for

summary judgment, the question that must be answered with respect to this element is whether a reasonable jury could conclude that defendant "knew of and disregarded an excessive risk to [plaintiff's] health or safety and that [defendant] was both aware of facts from which the inference could be drawn that a substantial risk of serious harm existed, and also drew the inference." Caiozzo, 581 F.3d at 72 (internal quotation marks and alterations omitted); see also Salahuddin, 467 F.3d at 280 ("The reckless official need not desire to cause such harm or be aware that such harm will surely or almost certainly result. Rather, proof of awareness of a substantial risk of the harm suffices.").

Deliberate indifference is thus something more than "mere medical malpractice." Hathaway, 99 F.3d at 553. However, certain instances of medical malpractice evincing "'a conscious disregard of a substantial risk of serious harm'" can rise to the level of deliberate indifference. Id. (quoting Farmer v. Brennan, 511 U.S. 825, 839 (1994)). On the other hand, a poor medical judgment, such as "a delay in treatment based on a bad diagnosis or erroneous calculus of risks and costs" is likely not actionable because it does not evince the degree of culpability required for a constitutional claim. Harrison v. Barkley, 219 F.3d 132, 139 (2d Cir. 2000). Moreover, the medical judgments of prison officials and medical personnel are

accorded a "presumption of correctness." <u>Perez v. Cnty. of</u>
<u>Westchester</u>, 83 F. Supp. 2d 435, 440 (S.D.N.Y. 2000) (citing
<u>Kulak v. City of New York</u>, 88 F.3d 63, 77 (2d Cir. 1996)).

With the foregoing standards in mind, it must now be
determined whether there are any genuine issues of material fact
surrounding Hardy's claims of deliberate indifference against
each of the defendants.

**a. Rikers Island: Dr. Medard and City Defendants**

Hardy first asserts a claim of deliberate indifference
against those persons he believes mishandled his treatment at
Rikers Island: Officer Dorvil, Dr. Medard and additional unnamed
medical providers and correction officers. Hardy specifically
contends that at OBCC intake, defendants, including Officer
Dorvil and Dr. Medard, told Hardy "he was fine and sent him to
lockup," despite his complaints of extreme ear pain and
dizziness. Am. Compl. ¶ 34-35. Hardy further complains that
over a five-week period after intake, defendants, including
Officer Dorvil and Dr. Medard, denied him medical treatment
despite repeated requests. <u>Id.</u> ¶ 36. However, the record does
not support Hardy's claims against Dr. Medard and City
defendants.

First, the evidence contradicts Hardy's claims that he was
denied medical care at the October 15 intake and during his stay

at Rikers Island.  Instead, the evidence shows that Rikers Island intake personnel noted Hardy's ear infection and placed him on oral antibiotics.  Del Vecchio Decl., Ex. I at NYC5-9, Ex. J at NYC67.  A follow-up appointment took place on October 25, Del Vecchio Decl., Ex. I at NYC15, and the notes from this evaluation indicate that Hardy's symptoms had temporarily subsided.  Id. at NYC14.  When Hardy's symptoms returned, he was treated by Dr. Medard on November 5, id. at NYC13, and finally by an on-site ENT specialist on November 15, at which point he was exhibiting a good deal of swelling in his neck.  Id. at NYC22; 50-h Test. at 19.

It can be assumed that, if one were to view the condition in the abstract, Hardy's ear problems during his time at Rikers Island did constitute a sufficiently serious medical condition.[23] See Mendoza v. McGinnis, No. 05-CV-1124, 2008 WL 4239760, at *10 (N.D.N.Y. Sept. 11, 2008) (noting that cases addressing whether an ear condition constitutes a serious medical need are "equivocal and fact-specific" and finding inability to conclude

---

[23] Dr. Medard and City defendants argue that Hardy's condition was not as serious as he contends, pointing out that while at Rikers Island, Hardy opted to be sentenced to a "ninety-day boot camp-style" alternative program rather than a one-year sentence. 50-h Test. at 21-22.  According to Hardy, "the reason [he] accepted the ninety days is because [he] honestly didn't think [he] had a year in [him] to deal with the medical issue [he] was having because it was getting progressively worse at the [sic] point." Id. at 22.  For purposes of this motion, Hardy's explanation is accepted as true.

that plaintiff's ear pain did not constitute such a need).

However, Hardy cannot show that defendants' actions amounted to

a sufficiently seriously denial of adequate medical care for

this condition. See, e.g., Summerville v. Faciuna, No. 05-CV-

6459, 2009 WL 2426021, at *7 (W.D.N.Y. Aug. 6, 2009) ("Generally,

in cases involving delayed care, the Second Circuit has reserved

a finding of deliberate indifference for extreme cases, such as:

ignoring a life-threatening and fast-degenerating condition for

three days; delaying care as a form of punishment; or delaying

major surgery for over two years." (internal citations

omitted)).

    To the contrary, the evidence shows that the care given to

Hardy by Rikers Island staff was reasonably responsive to his

symptoms. Evidence shows that Hardy saw medical staff at intake

and at least four times during the remainder of his five-week

stay at Rikers Island. Id. at NYC6-10, 13-14, 22. Hardy was

immediately and continually treated with oral antibiotics and,

when his condition deteriorated, he was seen by Dr. Medard, who

prescribed additional medicine and referred Hardy to an ENT.

Id. at NYC13.[24] Hardy – while not refuting that he was seen by

"typical Rikers Island medical staff" prior to his visit to the

---

[24] Although Hardy's amended complaint alleges Dr. Medard was
present at Hardy's intake, the evidence contradicts this claim.
All forms and reports that bear Dr. Medard's name are dated
November 5, 2007, the only day Dr. Medard claims that he saw and
treated Hardy. Del Vecchio Decl., Ex. I at NYC13, 21, 33, 36.

ENT, 50-h Test. at 18 – argues that it was unreasonable that, after being referred to an ENT specialist by Dr. Medard, he was forced to wait ten days before seeing this specialist and even then, was only given access to the specialist because he underwent a fainting spell.  See Am. Compl. ¶ 36.  However, at this stage, Hardy's symptoms did not appear to be particularly alarming – Dr. Medard's notes from November 5 indicate that Hardy complained of pain, drainage, and decreased hearing, but that no bulging or perforation was present, as would later be the case.  See Del Vecchio Decl., Ex I at NYC 13.  Accordingly, there is simply no evidence that would allow a conclusion that, at this point in Hardy's illness, a ten-day wait to see a specialist – during a period in which Hardy's condition was being monitored and treated with antibiotics – was unreasonable.  Certainly, this delay does not rise to the level of a sufficiently serious denial of medical treatment that might substantiate a Fourteenth Amendment claim.  See Summerville, 2009 WL 2426021, at *8 (finding that, where a plaintiff exhibited similar symptoms, "[a] fourteen-day wait for outside consultation regarding [an ear] condition that was neither life-threatening nor fast-degenerating does not meet the sufficiently serious standard, especially when plaintiff received treatment and monitoring throughout that period").

Furthermore, Hardy has failed to satisfy the subjective element of the deliberate indifference inquiry.  There is simply no evidence to support the conclusion that Rikers Island staff intentionally or recklessly disregarded an excessive risk to Hardy's health.  Given this dearth of evidence and the continual treatment that the record indicates that Hardy received, no reasonable jury could conclude that deliberate indifference was present.

Because Hardy has failed to demonstrate that any Rikers Island staff or medical providers acted with deliberate indifference to his medical condition, Hardy's claim against the City for municipal liability based upon these defendants' alleged deliberate indifference to his medical needs also necessarily fails.[25]  See, e.g., Segal v. City of New York, 459 F.3d 207, 219 (2d Cir. 2006); Brodie v. Fuhrman, No. 07-CV-4212, 2010 WL 1189347, at *10 (E.D.N.Y. Mar. 29, 2010) (noting that there must be an underlying constitutional violation to support a Monell claim).  Summary judgment is thus granted on this claim as to City defendants and Dr. Medard.

---

[25] Moreover, no evidence has been presented to suggest that the alleged deprivations were the result of a custom or policy of the City, as is required to sustain a Monell claim of municipal liability under § 1983.  See Zahra v. Town of Southold, 48 F.3d 674, 685 (2d Cir. 1995); see also Monell v. Dep't of Soc. Servs. of New York, 436 U.S. 658, 691 (1978).

## b. Downstate

The evidence bearing on Hardy's treatment at Downstate is far less exculpatory. Although State defendants claim that Hardy "received a full medical work-up while at Downstate," Mem. Supp. State Defs.' Mot. Dismiss. ("State Mem. Supp.") at 2, the medical records do not indicate that Hardy received any medical care beyond a typical intake evaluation. Crediting Hardy's assertions that his ear condition was both obvious and incredibly painful, the lack of responsiveness exhibited by Downstate staff might appear quite troubling to a jury.

A recapitulation of Hardy's experience at Downstate is helpful here. The final record relating to Hardy's treatment at Rikers Island is a November 17 progress note indicating that Hardy's ear showed minimal redness and minimal exudate; Hardy claims that he also had swelling in his neck about "the size of a small golf ball" at that time. Del Vecchio Decl., Ex. I at NYC10; 50-h Test. at 19. Hardy claims that when he was transferred to Downstate about ten days later, he was experiencing extreme pain, blurred vision, discharge from his ear, hearing loss and increased swelling in his neck, "noticeable to the naked eye." 50-h Test. at 23. Hardy alleges that despite his pleas for medical staff to send him to a specialist, the correction officer at intake stated "we're not going to do nothing here because we're a transit facility, you

deal with that when you get to your permanent jail." 50-h Test. at 25. The amended complaint alleges that this statement was reiterated by P.A. Noriel DeGuzman, who then "refused to give any medical attention to plaintiff." Am. Compl. ¶ 42.

Hardy was incarcerated at Downstate from about November 27 to December 4, after which time he was transferred to Willard. During these eight days, there is no evidence that Hardy received treatment for his ear despite the fact that, according to Hardy's testimony, his ear's condition deteriorated considerably. According to Hardy, the pain was "literally unbearable . . . to the point [he] couldn't walk." 50-h Test. at 24. State health records corroborate the state of Hardy's ear condition as of the end of his time at Downstate: the day after Hardy was transferred from Downstate to Willard, staff noted that he complained of "excruciating pain" and that he was keeping a wad of toilet paper in his ear, which revealed "cream colored drainage" when removed. Bauman Decl., Ex. C at MED 023.

Based on these facts, a reasonable jury might find that Hardy's claim against Downstate staff satisfies both the objective and subjective components of medical indifference. With respect to the objective element, the record reflects that Downstate officials failed to provide any treatment for Hardy's ear condition. Therefore, it must only be determined whether Hardy's ear condition, at that time and in the abstract, was

"sufficiently serious." Salahuddin, 467 F.3d at 280. State defendants argue that Hardy's "medical condition [was] not a life-threatening situation that would pass muster under Eighth Amendment scrutiny." State Mem. Supp. at 6. But Hardy need not show that his condition was life-threatening. Brock, 315 F.3d at 162-63. Instead, factors include "(1) whether a reasonable doctor or patient would perceive the medical need in question as important and worthy of comment or treatment, (2) whether the medical condition significantly affects daily activities, and (3) the existence of chronic and substantial pain." Id. (internal quotation marks omitted).

Viewing the facts in the light most favorable to Hardy, his ear infection could certainly be perceived as "worthy of comment or treatment," given the amount of swelling and drainage described and his difficulties in walking. Moreover, Hardy's description of his condition at that point certainly includes "chronic and substantial pain." See 50-h Test. at 38-43; Pl.'s Ex. D at 191 (noting Hardy was in "excruciating pain" on December 5). Lastly, Hardy's claims of extreme pain, blurred vision, reduced hearing and occasional dizziness indicate that his condition did significantly interfere with his daily activities. See Chance v. Armstrong, 143 F.3d 698, 702 (2d Cir. 1998).

There are also disputed factual issues regarding whether Downstate staff acted with deliberate indifference to Hardy's needs. The evidence shows that staff was aware of Hardy's ear condition, Bauman Decl., Ex. B at MED 006, 099, 100 (all noting ruptured ear drum or ear problem), but declined to provide him any medical care despite Hardy's pleas that he be taken to a specialist. Instead, staff simply explained to Hardy that they planned to do nothing because Downstate was a transit facility.[26] Based on these facts, a reasonable jury might conclude that staff was aware that Hardy's infection, at that point, presented a substantial risk of serious harm, but nevertheless was deliberately indifferent to his medical needs. Cf. Harrison v. Barkley, 219 F.3d at 139 (explaining that "consciously disregarding an inmate's legitimate medical needs is not 'mere medical malpractice,'" but instead amounts to culpable behavior).

For these reasons, summary judgment is denied as to defendant DeGuzman and the John Doe Correction Officers in the

---

[26] The fact that defendants may have based their refusal to treat Hardy on prison policy does not negate a finding of subjectively deliberate indifference. The issue then becomes "whether a jury could find that the application of the policy in plaintiff's case could have amounted to deliberate indifference to plaintiff's medical needs." Johnson v. Wright, 412 F.3d 398, 404 (2d Cir. 2005). In this case, a jury might find that application of this blanket policy of not providing any treatment amounted to deliberate indifference to Hardy's observable and painful ear condition.

employ of NYS DOCS on Hardy's claim that he suffered deliberate indifference in violation of § 1983 during his incarceration at Downstate.

### c. The Willard Correction Officers

Hardy's final claim of deliberate indifference is against various persons at Willard. With respect to his claim of deliberate indifference against the Willard Correction Officers, Hardy alleges that despite being "in really bad shape" when he reached Willard on or about December 5, it was several days before the officers allowed him to see a nurse practitioner. Am. Compl. ¶ 44-45. Hardy contends that it was only after his mother called the facility, threatening to take legal action, that the Willard Correction Officers allowed him to see an ENT specialist. Id. ¶ 46. Furthermore, Hardy contends, after his surgery on January 3, 2008, the Willard Correction Officers "refused him follow-up treatment or appointments with the doctor." Id. ¶ 53.

The evidence in the record, however, directly contradicts Hardy's claims. Although Hardy's ear indeed seems to have been in "bad shape" when he arrived at Willard, medical records, and Hardy's own 50-h testimony, indicate that he saw a nurse practitioner on the day of intake and frequently after intake. 50-h Test. at 26; Bauman Decl., Ex. C at MED 002, 020-023.

Moreover, although Hardy is upset about the amount of time it took for him to see an ENT, it is not clear that the Willard Correction Officers were in a position to refer Hardy to an ENT specialist – the record indicates that it was Willard medical staff who eventually completed this referral for Hardy. Bauman Decl., Ex. C at MED 067. Finally, with respect to Hardy's claims of lack of access to treatment after surgery, the evidence shows that Hardy was kept in Willard's infirmary for at least three days following his surgery, Pl.'s Ex. D at 162; 50-h Test. at 31, had a consultation with Dr. Pathak approximately one week later, and had additional appointments throughout his stay at Willard. See, e.g., Bauman Decl., Ex. C at MED 034, 044, 048; Pl.'s Ex D. at 178–82.

All of this available evidence points to the conclusion that the Willard Correction Officers did not unreasonably interfere with Hardy's access to medical staff. Hardy's deliberate indifference claim against the Willard Correction Officers is, therefore, unsupported by the record, making summary judgment in favor of Officer Reynolds, Officer B. Lewis, Officer G. Lewis, Officer T. Lewis and John Doe Correctional Officers at Willard appropriate.

**d. Nurse Dalecki and Other Unnamed Willard Medical Providers**

Hardy also alleges deliberate indifference on the part of Willard medical staff, including Nurse Dalecki.  Summary judgment on these claims is denied.  Although Hardy was seen by Willard medical staff on numerous occasions, their responses to his complaints were sometimes so underwhelming as to possibly constitute deliberate indifference.

First, it appears that Willard medical staff's responses to Hardy's condition pre-surgery may have amounted to a sufficiently serious deprivation of adequate medical care. Hardy arrived at Willard in an obviously debilitated condition, complaining that he was in "excruciating pain" and that his ear was "draining green/yellow."  Bauman Decl., Ex. C at MED 023. Upon removing a wad of toilet paper from Hardy's ear, "cream colored drainage" was observable.  Id.  In response to these problems, on December 6, a day or so after intake, Willard medical staff took an ear culture from Hardy, ordered various medications and scheduled a follow-up appointment for one week later.  Id. at MED 022, 029.  On December 10, although Hardy returned with worsened symptoms, he was simply told to take his medication.  Id. at MED 021.  He returned again the following day with increased discomfort.  Id.  At this point, at least six days after intake, they put in an OTO referral.  Id.  However, rather than file an "emergency" or even "urgent" request, staff

requested the referral "soon," not due to occur for another two weeks.  Id. at MED 067.

On December 17, one week later, Hardy was back in the infirmary, in pain and dizzy, stating "I need to go to a hospital."  Id. at MED 020.  Hardy also explained to staff that he had not been taking his Cipro as directed because the information sheet stated not to take it in combination with his other medication.  Id.  In response, defendants appear simply to have instructed Hardy again to take his medication.  Id.  Given the desperation of Hardy's complaints and the possible gravity of his situation, this (non)treatment could be interpreted as creating a sufficiently serious deprivation of care.

Moreover, additional evidence points to a possible lack of adequate attention to Hardy's condition.  Hardy's ENT consult with Dr. Pathak on December 21 led Dr. Pathak to recommend an immediate CT scan and to schedule surgery.  See Bauman Decl., Ex. C at MED 067.  After this appointment, there do not appear to be any treatment notes until an unexplained emergency "Request and Consultation" form, filled out by a Dr. Graceffo on either December 25 or December 28.  Id. at MED 038.  Because of this lack of treatment notes, it is impossible to know what prompted Dr. Graceffo's emergency request.  However, it is clear that Hardy's CT scan, which Dr. Pathak had requested "ASAP" a week earlier, was not completed until after Hardy's condition

developed into an emergency – a timeline that might appear troubling to a jury. Given the lack of treatment notes for this period, and the often underwhelming responses of Willard medical staff when they did see Hardy, it cannot be said, as a matter of law, that Willard medical providers' responses to Hardy's condition in the weeks leading up to his surgery did not amount to a sufficiently serious deprivation of medical care. See, e.g., Mobley, 2006 WL 197185, at *6 (reasoning, on a motion to dismiss where plaintiff alleged he had waited eight hours for an ambulance to arrive, that a defendant's failure to convey the seriousness of the situation or to place a follow-up call could amount to deliberate indifference); Summerville, 2009 WL 2426021, at *7 (explaining that one situation that rose to the level of deliberate indifference was ignoring "a life-threatening and fast-degenerating condition" for three days).

Turning to the second, subjective prong of deliberate indifference, a reasonable jury might also conclude that Willard medical staff's understated response to Hardy's obviously painful condition demonstrated reckless disregard of a known risk. Given Hardy's repeated and dramatic remonstrations, Willard medical staff was clearly aware of his condition, although it is not clear whether or not they understood the gravity of it. Instructing Hardy to take his medicine as previously directed, providing him with an OTO referral "soon,"

and allowing Hardy's condition to deteriorate for a week into an
"emergency" before procuring for him a CT scan (requested
"ASAP") may have all been within the bounds of appropriate
responses. But these responses could also be seen as so
dismissive that they border on deliberate indifference.[27]

Furthermore, Hardy's 50-h testimony presents a troubling
narrative regarding the level of care he received post-surgery.
After surgery on January 3, Hardy testifies that his hearing got
worse and "not only did they not remove the abscess, but they
. . . gave me a staff [sic] infection due to unsanitary utensils
and unsanitary after-care." 50-h Test. at 36. Hardy alleges
that Willard staff told him to wait until he got home to get
major treatment for this infection, and in the meantime,
provided him only "Motrin and a Band-aid." Id.

To be sure, records from Hardy's post-operative treatment
include frequent progress notes and follow-up appointments.
However, drawing all inferences in Hardy's favor, it reflects
very poorly on Hardy's post-operative treatment that, following
a brief period of recovery post-operation in January 2007,
Hardy's condition consistently deteriorated during his remaining
two months at Willard, to the point where doctors at the

---

[27] An additional fact that might point towards a finding of
deliberate indifference is Hardy's claim that he was only
finally seen by an OTO because his mother called Willard
threatening suit if no treatment was provided. See Bauman
Decl., Ex. C at MED 020.

Manhattan Eye and Ear Hospital pronounced him to be "in extremely bad shape" a few days after his release and hospitalized him immediately. 50-H Test. at 37-38. Indeed, the record reflects that at appointments throughout January and February, swelling, pressure and pain were consistently noted, as was the continued existence of a mastoid abscess and "copious . . . purulent drainage." Pl.'s Ex. D at 178-85. Despite this, the only form of treatment noted in the record appears to be antibiotics – which, given Hardy's persistent decline, seem to have been largely ineffective – and further testing and follow-up appointments. Id.

Thus, even though the record shows that staff was clearly monitoring Hardy's condition during this two-month period during which it degenerated, there are unresolved issues of fact as to whether their responses to Hardy's symptoms of infection were adequate. In evaluating the seriousness of any inadequacies in this case, it should be emphasized that Hardy has testified that it was delay in treating his infection that ultimately caused his ear canal to rip, resulting in left ear deafness. See 50-h Test. at 42-43. This allegation only reinforces the conclusion that the potential inadequacies in his post-operative treatment may have been sufficiently serious to amount to a constitutional deprivation. Cf. Johnson v. Wright, 234 F. Supp. 2d 352, 360 (S.D.N.Y. 2002) ("The fact that a plaintiff received regular

medical care does not preclude a finding of deliberate indifference where the course of treatment was largely ineffective and the defendant declined to do anything more to attempt to improve the plaintiff's situation." (internal quotation marks and alterations omitted)).  Of course, it may also be that Willard medical staff's responses were perfectly justified and entirely reasonable, but the evidence does not allow for this determination to be made on summary judgment.

Finally, questions of fact also exist as to whether Willard medical providers were, subjectively speaking, deliberately indifferent during Hardy's post-operative care.  Crediting Hardy's testimony that staff declined to provide him any more than "Motrin and a Band-aid" because they wanted him simply to wait until after his release to seek care, 50-H Test. at 36, 39, Willard staff's potentially inadequate treatment might be seen as a deliberate decision on its part to postpone treatment that they knew Hardy needed.

In sum, although Willard medical staff did take some actions to treat Hardy, the evidence in the record does not permit the conclusion that no reasonable jury could find the Willard medical staff's responses seriously inadequate. Although it is also unclear whether any inadequacies in care arose from intentional disregard, rather than mere negligence or poor medical judgments, this too is a question of fact that is

not appropriate for resolution on a motion for summary judgment. See, e.g., Briecke v. Coughlin, No. 92-CV-1211, 1994 WL 705328, at *4 (N.D.N.Y. Dec. 16, 1994) ("We are quite mindful of the fact that plaintiff's health records show a great deal of attention to him by the medical staff . . . . The evidence at trial may show nothing less than caring and competent medical treatment. . . . The difficulty, however, is that defendants have failed to meet the high standard for summary judgment."); Johnson, 412 F.3d at 404 (vacating grant of summary judgment because, although a jury might conclude that none of the defendants acted with a "sufficiently culpable state of mind," a jury could also possibly reach the opposite result); see also Archer v. Dutcher, 733 F.2d 14, 16 (2d Cir. 1984) (reversing district court's grant of summary judgment because, although appellees' evidence "substantiate[d] the conclusion that appellees provided . . . comprehensive, if not doting, health care," appellant's affidavit in opposition at least created material factual disputes).  Accordingly, summary judgment is denied with respect to Hardy's claims of deliberate indifference against Nurse Dalecki and other unnamed Willard medical providers.

**e. Defendant Dr. Pathak**

There are also issues of material fact that preclude granting summary judgment on Hardy's claim of deliberate indifference against Dr. Pathak.  The success of Hardy's claim of deliberate indifference against Dr. Pathak turns in large part on how much control Dr. Pathak had over Hardy's care during Hardy's time at Willard.  The evidence presented does not make clear Dr. Pathak's role, but leaves open the possibility that Dr. Pathak had considerable oversight of Hardy's potentially inadequate treatment.

Dr. Pathak appears to have first seen Hardy on December 21, as a result of the December 11 OTO referral from Willard staff.  Bauman Decl., Ex. C at MED 020.  Dr. Pathak's orders from that day included a course of Cipro until the time of surgery, a CT scan "ASAP" and a mastoidectomy needed "soon" to relieve the abscess.  Id. at MED 067; see also 50-h Test. at 28.  Following this consultation, it appears that no action was taken until the December 28 CT scan at Cayuga.  Regarding this December 28 appointment, Hardy alleges that Dr. Pathak ordered him back to prison from Cayuga even though the Cayuga radiologist explained that Hardy needed emergency surgery and should be admitted immediately to Cayuga.  50-h Test. at 29.  Plaintiff's testimony is at least partially corroborated by State defendants' evidence, which shows that an unidentified Willard doctor indeed

spoke with the radiologist, who suggested that Hardy be transferred to Cayuga. Bauman Decl., Ex. C at MED 038. The doctor's notes indicate that this suggestion was conveyed to Dr. Pathak, but that Dr. Pathak stated that the CT results were "not unexpected" and that surgery would proceed as scheduled on January 3. Id. Hardy suggests that Dr. Pathak may have responded in this way because emergency treatment would have cost the State considerably more than they were paying Dr. Pathak under a pre-arranged agreement. 50-h Test. at 30.

Dr. Pathak's decision not to transfer Hardy to Cayuga at the time of his CT scan resulted in about a five-day gap between the date of Hardy's noted "emergency" condition and the radiologist's recommended hospitalization, and the date on which surgery was in fact performed. Hardy has alleged that during this time he "passed in and out of consciousness and was unable to eat, see, or hear." Am. Compl. ¶ 51. State defendants have submitted no evidence to refute this claim and nothing indicates that Hardy's condition was monitored during this period of time. Instead, to defend Dr. Pathak's conduct, State defendants rely on the argument that Hardy's condition was not life-threatening, that the radiology report merely suggested "evaluat[ion] for timely surgical evacuation," Bauman Decl., Ex. C at MED 039, and that the January 3 surgery was appropriate given Hardy's condition.

However, again, whether Hardy's condition was life-threatening is not the crucial inquiry. See Brock, 315 F.3d at 162-63. The question is whether, given Hardy's condition, the five-day delay in surgery, possibly occasioned by Dr. Pathak, constituted a sufficiently serious denial of adequate medical care and, if so, whether Dr. Pathak was aware of facts from which a jury might infer that he was deliberately indifferent to a serious risk to Hardy's well-being. See Salahuddin, 467 F.3d at 280. The radiology report does not settle the reasonableness of this five-day delay, because crediting Hardy's assertion that the radiologist recommended emergency surgery, surgery five days later may or may not have been "timely" in this case.

Viewing the evidence in the light most favorable to Hardy, his need at this point appears to have been severe. Dr. Pathak at least to some extent knew of the severity, as he was put on notice by the Cayuga radiologist that Hardy's condition might warrant a transfer to the hospital. In spite of this, it appears that Dr. Pathak simply noted that "the CT results [were] not unexpected," Bauman Decl., Ex. C at MED 038, suggesting he may have made no effort to inquire further into Hardy's condition, nor to ensure that staff monitor Hardy's status in the subsequent days. Moreover, someone from Cayuga noted on a release form that Hardy should return to Cayuga if he was running a fever, id. at MED 061, which he clearly was at the

time Dr. Pathak ordered him returned from Cayuga.  See Pl.'s Ex.
D at 35, 120, 220.  The record does not make clear whether this
fever persisted following Hardy's return to Willard.

Dr. Pathak's actions may amount to nothing more than a
medical judgment that, given Hardy's condition, an immediate
transfer on December 28 was not warranted.  Such a medical
judgment, even if unsound, would not constitute deliberate
indifference.  See Harrison, 219 F.3d at 139 (distinguishing a
delay based on mistake or medical judgment from more culpable
conduct); see also Salahuddin, 467 F.3d at 282 (explaining that
the mental-state inquiry "does not include an objective-
reasonableness test").  On the other hand, a reasonable jury
might find that Dr. Pathak was made aware of an excessive and
avoidable increase in the risk Hardy faced to his health, but
that he disregarded that risk based simply on the fact that a
surgery date had already been scheduled.  This disputed issue of
fact precludes summary judgment on Hardy's claim against Dr.
Pathak.  See Kaminsky v. Rosenblum, 737 F. Supp. 1309, 1317
(S.D.N.Y. 1990) (finding, when an outside physician recommended
immediate hospitalization but prison doctor delayed five days,
resulting in inmate's death, that summary judgment could not be
granted because prison doctor's delay may have amounted to
deliberate indifference); see also Johnson, 412 F.3d at 404
(finding a genuine issue of material fact where treating

physicians recommended a course of conduct that was not followed based on possibly medically-erroneous DOCS policy); Salahuddin, 467 F.3d at 282 (explaining that willful blindness to an inmate's needs can constitute deliberate indifference, if a provider has been warned that postponing treatment might be harmful).

Moreover, as mentioned above with respect to the Willard medical providers, Hardy's testimony regarding his treatment post-operation is also troubling.  It is clear that Dr. Pathak saw plaintiff on multiple occasions following his surgery, and that Dr. Pathak recommended a further CT scan if Hardy's conditions persisted – a recommendation that was eventually followed.  See Bauman Decl., Ex. C at MED 044.  However, Hardy's testimony indicates that his post-operative treatment provided him little actual relief from his painful medical condition, despite repeated visits with medical staff and Dr. Pathak, and that this lack of substantive treatment is the primary reason that he was, as of August 2008, deaf in his left ear.  See 50-h Test. at 42-43.  To the extent that Dr. Pathak was responsible for making decisions about the course Hardy's treatment took during these months, such decisions might constitute deliberate indifference.

It may well turn out that a CT scan, continued antibiotics, careful monitoring and a follow-up appointment scheduled post-

release were all reasonable responses to Hardy's condition at this point. But the facts do not permit this conclusion as a matter of law, particularly given the severity of Hardy's condition as of his discharge from Willard. The fact that following his discharge from Willard, plaintiff was quickly admitted "in extremely bad shape" for multiple emergency surgeries at Manhattan Eye and Ear Hospital, see id. at 37-40, reinforces the conclusion that Dr. Pathak's and the Willard medical provider's treatment of Hardy's condition in the months leading up to his discharge could be seen by a jury as seriously inadequate, and recklessly so.

For all of these reasons, a grant of summary judgment is inappropriate with respect to plaintiff's claim of deliberate indifference against Dr. Pathak.


## (5)

### Qualified Immunity Against Deliberate Indifference Claims

State defendants claim that even if their actions might have amounted to deliberate indifference, they are entitled to qualified immunity on this claim. "Government actors are entitled to qualified immunity 'insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" Okin v. Vill. of Cornwall-On-Hudson Police Dep't, 577 F.3d 415, 432-33

(2d Cir. 2009) (quoting <u>Harlow v. Fitzgerald</u>, 457 U.S. 800, 818 (1982)).

There is undoubtedly a clearly established right to be free from deliberate indifference to serious medical needs.  <u>See</u> <u>LaBounty v. Coughlin</u>, 137 F.3d 68, 74 (2d Cir. 1998) (citing <u>Estelle v. Gamble</u>, 429 U.S. 97, 104 (1976)).  Nevertheless, even in the case of clearly defined rights, "qualified or good faith immunity might still be available as a bar to a plaintiff's suit if it was objectively reasonable for the public official to believe that his acts did not violate those rights."  <u>Kaminsky v. Rosenblum</u>, 929 F.2d 922, 925 (2d Cir. 1991).  But whether particular acts should be considered objectively reasonable is a highly fact-specific inquiry.  <u>See</u> <u>id.</u>  Given that there are issues of fact as to the conduct of P.A. Noriel DeGuzman, the John Doe Correction Officers at Downstate, Nurse Dalecki, Dr. Pathak and other unnamed Willard medical providers towards Hardy, it cannot be determined whether it was objectively reasonable for these defendants to believe that their actions did not violate clearly established law.  <u>See</u> <u>id.</u> at 927 (finding the defense unavailable where "resolution of the objective reasonableness of defendants' actions turn[ed] on disputed questions of fact that preclude[d] the granting of summary judgment").  Summary judgment is therefore denied on State defendants' claim of qualified immunity as to P.A. Noriel

DeGuzman, the John Doe Correction Officers at Downstate, Nurse Dalecki, other unnamed Willard medical providers and Dr. Pathak.

## (6)

## False Arrest and Malicious Prosecution

Entirely separate from Hardy's claims of deliberate indifference are his claims for false arrest and malicious prosecution, which, as explained <u>supra</u>, will be evaluated on the pleadings alone. Hardy alleges that defendants arrested him "without a warrant and without any reasonable cause or belief that plaintiff was in fact guilty of any crime" and that "following his arrest, [he] was wrongfully, falsely and maliciously charged by defendants and prosecuted with various crimes of which he was innocent." Am. Compl. ¶¶ 64, 71.[28] However, as explained below, Hardy has failed to allege facts that could support a claim of either false arrest or malicious prosecution.

---

[28] Hardy does not specify in his complaint the particular defendants against whom he alleges these claims, but instead asserts them generally against "the defendants, their agents, servants and employees, including but not limited to the medical providers, police and correction officers and prison staff." Am. Compl. ¶ 62. However, it need not be considered whether Hardy has adequately alleged individual involvement against the named defendants, as his false arrest and malicious prosecution claims fail more broadly.

### a. False Arrest

Although Hardy does not specify whether he is bringing a false arrest claim pursuant to state or federal law, his amended complaint will be construed as alleging both a state law claim and a § 1983 claim for false arrest, as the two causes of action are substantially the same.  Jocks v. Tavernier, 316 F.3d 128, 134 (2d Cir. 2003).  To state a claim for false arrest under New York law — and by extension, under § 1983 — "plaintiff must show: (1) the defendant intended to confine the plaintiff, (2) the plaintiff was conscious of the confinement, (3) the plaintiff did not consent to the confinement and (4) the confinement was not otherwise privileged."  Bernard v. United States, 25 F.3d 98, 102 (2d Cir. 1994); see also Broughton v. State, 37 N.Y.2d 451, 456, 335 N.E.2d 310, 314, 373 N.Y.S.2d 87, 93 (1975).

The only element at issue in this case is whether Hardy's confinement was privileged.  This question turns on whether police officers had probable cause to arrest Hardy.  See Jocks, 316 F.3d at 135 (probable cause defeats a claim of unprivileged confinement).  Probable cause exists when an officer has "knowledge or reasonably trustworthy information of facts and circumstances that are sufficient to warrant a person of reasonable caution in the belief that the person to be arrested

has committed or is committing a crime." Id. (quoting Weyant v. Okst, 101 F.3d 845, 852 (2d Cir. 1996)).

Here, it appears clear that the police officers arresting Hardy did so pursuant to an outstanding warrant for a parole violation. Although portions of Hardy's amended complaint recite that the officers arrested him "without a warrant and without any reasonable cause or belief that plaintiff was in fact guilty of any crime," Am. Compl. ¶ 30, Hardy concedes in his 50-h testimony that the officers discovered that Hardy had an active parole violation for absconding after they ran his name. 50-h Test. at 14. Nevertheless, Hardy argues that his arrest was improper because this parole violation was, in fact, invalid. In brief, the thread of this argument is that because Hardy was sentenced to parole administratively by NYS DOCS, rather than by his sentencing judge, his parole was never valid and thus he could not have violated it.[29]

Hardy is far from the first plaintiff to make this argument. Claims of false arrest pursuant to violations of

---

[29] It is clear that a term of PRS was required as part of Hardy's robbery conviction under N.Y. Penal Law § 70.45 (McKinney 1998). At the time Hardy was sentenced for this crime, N.Y. Penal Law § 70.45 stated, in relevant part, that "[e]ach determinate sentence also includes, as a part thereof, an additional period of post-release supervision." N.Y. Penal Law § 70.45 (McKinney 1998) (amended 2008). However, until recently, "there was a significant degree of confusion and inconsistency regarding when, how, and by whom the PRS term was to be imposed." Mickens v. State, 2009 N.Y. Slip. Op. 29256, 25 Misc. 3d 191, 194, 881 N.Y.S.2d 854, 858 (Ct. Cl. May 26, 2009).

administratively imposed PRS have been brought by numerous
plaintiffs in federal and state courts, occasioning a
substantial amount of precedent.  Hardy is correct that NYS
DOCS's practice of administratively imposing PRS has been held
invalid by both the Second Circuit and the New York Court of
Appeals.  Prior to the date of Hardy's arrest, in Earley v.
Murray, the Second Circuit held that administrative imposition
of PRS terms violated the Due Process clause of the Fourteenth
Amendment, stating that "[o]nly the judgment of a court, as
expressed through the sentence imposed by a judge, has the power
to constrain a person's liberty."  451 F.3d 71, 75-76 (2d Cir.
2006).  Approximately two years later, the New York Court of
Appeals clarified – without reaching any constitutional claims –
that NYS DOCS does not have the authority, under New York
statutory law, to impose PRS terms.  See People v. Sparber, 10
N.Y.3d 457, 859 N.Y.S.2d 582, 889 N.E.2d 259 (2008); Garner v.
N.Y. Dep't Of Corr. Servs., 10 N.Y.3d 358, 362, 859 N.Y.S.2d
590, 889 N.E.2d 467, 470 (2008) ("As we explained today in
[Sparber], the combined command of CPL 380.20 and 380.40 is that
the sentencing judge – and only the sentencing judge – is
authorized to pronounce the PRS component of a defendant's
sentence." (emphasis added)).  New York has since passed
corrective legislation to end the practice of administratively

imposed PRS.  See Knowles v. Johnson, No. 08-CV-4741, 2010 WL

1050973, at *2 (S.D.N.Y. Mar. 23, 2010).

However, the fact that administratively imposed PRS has

been invalidated as a practice does not change the conclusion

that Hardy's arrest was privileged.  It has been frequently held

by courts examining the issue that arrests for violations of

administratively imposed PRS are privileged.[30]  This is the case

because "an arrest and imprisonment are privileged where the

arrest is made pursuant to a warrant valid on its face and

issued by a court having jurisdiction . . . even though the

_____

[30] It is noted that there is at least one conflicting case from
the New York Court of Claims with regards to whether such
confinement is privileged.  See Mickens, 25 Misc. 3d at 204
(holding that claimant's confinement, pursuant to a facially
valid warrant for a violation of his administratively imposed
PRS term, was not privileged because NYS DOCS did not have
jurisdiction to impose PRS).  However, Mickens is likely no
longer valid for this point of law, as the Appellate Division
subsequently held that such confinement was privileged.  See
Collins v. State, 69 A.D.3d 46, 51, 887 N.Y.S.2d 400, 404 (4th
Dep't 2009) (noting that approximately 250 defendants had
brought claims for unlawful imprisonment based on
administratively imposed PRS in the Court of Claims, with
varying outcomes, but that it was the first Appellate Division
to rule on the issue).  Even to the extent that Mickens is still
good law, the court there held that "a claim for false
imprisonment may be maintained only when, and to the extent
that, a claimant alleges and proves that some portion of the
time he served under PRS was caused solely by DOCS' imposition
of a longer term of PRS than a court would have imposed."
Mickens, 25 Misc. 3d at 207.  Hardy does not allege that the PRS
term actually imposed upon him was longer than that which should
have been judicially imposed.

process may have been erroneously or improvidently issued."[31]
Nazario v. State, 24 Misc. 3d 443, 449 884 N.Y.S.2d 580, 587
(Ct. Cl. 2009) (finding that plaintiff did not state a claim for
false arrest based on confinement pursuant to a warrant for
violation of NYS DOCS-imposed PRS) (internal quotation marks
omitted).  It follows that when an arresting officer has
"reasonable cause" to believe that a person has violated his PRS
– even if that PRS turns out to have been improperly
administratively imposed – he is "statutorily-authorized to
arrest and detain" the individual.  Knowles, 2010 WL 1050973, at
*4; see also Collins v. State, 69 A.D.3d 46, 51, 887 N.Y.S.2d
400, 404 (4th Dep't 2009) (holding that claimant was unable to
establish claim for unlawful imprisonment based on

---

[31] Although it has been further argued that any arrest warrant
issued for violation of administrative PRS was not issued "by a
court having jurisdiction," New York's Fourth Department has
explained that for a false arrest claim to succeed on this
ground, it must be shown that there was a "clear absence of any
jurisdiction over the subject matter," rather than simply an act
"in excess of . . . jurisdiction."  Collins v. State, 69 A.D.3d
46, 51-52, 887 N.Y.S.2d 400, 404 (4th Dep't 2009).  The Fourth
Department went on to hold that because the Division of Parole
had some jurisdiction over sentencing, but merely exceeded this
jurisdiction in administratively imposing PRS, confinement
pursuant to an arrest for violating administratively imposed PRS
was privileged.  Id.  Although Collins dealt with PRS imposed by
the Division of Parole, the court analogized administrative
imposition by the Division to administrative imposition by NYS
DOCS, and recognized that both NYS DOCS and the Division have
some jurisdiction over sentencing issues.  Collins v. State, 69
A.D.3d at 52 ("While the Court of Appeals in Garner and Sparber
determined that a period of PRS may not be administratively
imposed, DOCS and the Division are not always precluded from
clarifying the sentence of a defendant.").

administratively imposed term of PRS because warrant for alleged

violation of PRS was facially valid); Santiago v. Fischer, No.

09-CV-1383, 2009 WL 3852001, at *7 (E.D.N.Y. Nov. 18, 2009)

(adopting the court's reasoning in Nazario in dismissing false

arrest claim when plaintiff conceded arrest was pursuant to a

facially valid parole warrant for violation of PRS term imposed

by NYS DOCS).

Therefore, "absent either an allegation or inference that

the parole warrant . . . was invalid on its face," an arrest and

confinement for a violation of administratively imposed PRS is

"privileged and 'sufficient to protect officials who carried out

its mandates' from liability for false imprisonment." Nazario,

24 Misc. 3d at 448-49. Here, Hardy does not argue that the

warrant issued for his parole violation was not facially valid.

Thus, Hardy's arresting officers had reason to believe they were

acting pursuant to a valid warrant, which sufficiently

established probable cause for his arrest. Cf. id.; United

States v. Towne, 870 F.2d 880, 884-85 (2d Cir. 1989) (finding

that officer had probable cause for arrest even though the

arrest warrant that he discovered in a computerized database was

improper, when the officer confirmed that the warrant was

outstanding and had no reason to know it was improper).

It should be further noted that even if Hardy's arrest were

determined to be unprivileged, defendants would have a strong

claim of qualified immunity.  Qualified immunity shields an

arresting officer from a suit for damages "if a reasonable

officer could have believed [the arrest] to be lawful, in light

of clearly established law and the information the [arresting]

officers possessed."  Hunter v. Bryant, 502 U.S. 224, 227 (1991)

(internal quotation marks omitted).  In this case, there are two

separate reasons why qualified immunity would attach: first, the

law was not clearly established; and second, even if it had

been, it would still have been reasonable for the arresting

officers to rely on Hardy's outstanding PRS violation.

On the first point, it would not necessarily have been

clear to a reasonable officer as of 2007 – the year of Hardy's

arrest – that arresting a person for violating administratively

imposed PRS was improper.  Although the Second Circuit in Earley

determined that the administrative imposition of PRS was

unconstitutional, a recent Eastern District of New York case

explained that the law regarding whether persons could still be

arrested for violating administratively imposed PRS remained

unsettled for several years after Earley:

> In Earley v. Murray . . . the Second Circuit held
> that the administrative imposition of a five-year PRS
> term by DOCS, pursuant to New York Penal Law § 70.45,
> was unconstitutional.  However . . . .  even after
> Earley, state courts continued to disagree as to the
> precise application of Earley to Section 70.45, and
> some state courts held that PRS was automatic under
> state law such that it was not administratively
> imposed in violation of Earley.  Similarly, Earley

did not address the effect of its decision on those
currently incarcerated due to violations of
administratively imposed PRS terms or those currently
under supervision for administratively imposed PRS
terms.  In other words, it was unclear whether
(1) the jail house doors had to be opened for those
in custody on violations of administratively imposed
PRS terms, and supervision immediately terminated for
those individuals with administratively imposed PRS
terms, or (2) enforcement of the PRS terms could
continue under state law until there was a re-
sentencing which either eliminated the term or
corrected the procedural error in the imposition of
the PRS term.

Ruffins v. Dep't of Corr. Servs., No. 08-CV-5240, --- F. Supp.

2d ----, 2010 WL 1267810, at *1, 19 (E.D.N.Y. March 31, 2010).

Therefore, Ruffins concluded that this "critical ambiguity

regarding the implications of the Earley decision on those

currently under PRS supervision" meant that "the defendants

[were] entitled to qualified immunity for any conduct with

respect to the arrest and incarceration of plaintiff in 2007 for

violation of the terms of his PRS."[32]  Id.; see also Scott v.

Fischer, 2010 WL 2991085, at *6 (declining to decide whether

---

[32] It should be noted that another recent Eastern District of New
York case held that Earley did clearly establish the right not
to be arrested for violations of administratively imposed PRS,
such that defendants were not entitled to qualified immunity for
the plaintiff's post-Earley arrest.  See Santiago v. Fischer,
No. 09-CV-1383, 2009 WL 3852001, at *5-6 (E.D.N.Y. Nov. 18,
2009).  However, Santiago differs from Ruffins, and from the
instant case, in that the plaintiff in Santiago was not arrested
until after the New York Court of Appeals also invalidated the
practice of administratively imposed PRS, in 2008.  See id.
Therefore, the court in Santiago did not have to consider the
more unsettled state of the law on this issue in 2007 in
particular.

_Earley_ clearly established the unconstitutionality of administratively imposed PRS, but noting that it may not have because "two Departments of the New York Appellate Division thereafter continued to find the practice constitutional"); _Rodriguez v. Fischer_, No. 08-CV-4662, 2010 WL 438421, at *6 (E.D.N.Y. Feb. 3, 2010) (finding that officers were entitled to qualified immunity on plaintiff's claim of arrest for violation of administratively imposed PRS "[s]ince New York courts were in disagreement regarding the propriety of administratively imposed PRS at the time of Plaintiff's post _Earley_ arrests and confinements"). This rationale is equally applicable to Hardy's claim of false arrest, entitling his arresting officers to qualified immunity.

Moreover, even assuming _arguendo_ that _Earley_ might have clearly established that persons could not be arrested for violating administratively imposed PRS, Hardy's particular arresting officers still could not be said to have acted unreasonably. "Even law enforcement officials who 'reasonably but mistakenly conclude that probable cause is present' are entitled to immunity." _Hunter v. Bryant_, 502 U.S. at 227 (internal quotation marks omitted). Based on this principle, several courts within the Second Circuit "have held that it is reasonable for a police officer to rely on a computerized records check when determining whether there is probable cause

to arrest an individual," even when such a computerized record check produces an erroneous result. <u>Scott v. Fischer</u>, No. 07-CV-11303, 2009 WL 928195, at *5 (S.D.N.Y. March 30, 2009) (collecting cases), <u>aff'd</u>, 2010 WL 2991085 (2d Cir. Aug. 2, 2010).

In the instant case, there is no allegation that Hardy's arresting officers specifically knew, or should have known, that Hardy had his PRS term imposed administratively. They simply ran his name and found a PRS violation, leading them to believe that they had probable cause to arrest Hardy. Even if this belief was mistaken, it was a reasonable one, further entitling these officers to qualified immunity. <u>Cf. id.</u> at *5-6 (finding that qualified immunity barred plaintiff's false arrest claim for violation of administratively imposed PRS, because the officer had no way of knowing PRS was improperly imposed).

For these reasons, defendants' motion to dismiss Hardy's claim of false arrest is granted.

### b. Malicious Prosecution

Hardy's amended complaint also alleges malicious prosecution. Am. Compl. ¶ 71. In order to state a claim for malicious prosecution under New York law, a plaintiff must plead: (1) the commencement or continuation of a criminal proceeding by the defendant against the plaintiff, (2) the

termination of the proceeding in favor of the plaintiff, (3) the
absence of probable cause for the criminal proceeding, and
(4) actual malice.  Bernard, 25 F.3d at 104; Knowles, 2010 WL
1050973, at *5.  With regard to a § 1983 claim for malicious
prosecution, a plaintiff must further allege that defendant's
conduct resulted "in a constitutionally cognizable deprivation
of liberty."  Kinzer v. Jackson, 316 F.3d 139, 143 (2d Cir.
2003).

Here, Hardy's ninety-day sentence for his parole violation
constitutes a sufficient deprivation of liberty to state a
§ 1983 claim.  See Carrow v. City of New York, No. 07-CV-1436,
2010 WL 1009996, at *8 (S.D.N.Y. Mar. 17, 2010) (stating that
there was no "dispute that [p]laintiff, who was detained for
some four weeks, suffered a cognizable deprivation of liberty").
However, Hardy has failed to plead facts to support the elements
of malicious prosecution under state law.

Hardy's malicious prosecution claim suffers from several
defects.  First, it is not clear that NYS DOCS, NYCDOC or any of
their employees had personal involvement in Hardy's parole
violation hearing.  As the Second Circuit recently noted in
Scott v. Fischer, these hearings are typically conducted by the
New York State Division of Parole.  See 2010 WL 2991085, at *8
(dismissing claims against NYS DOCS because "the practice of re-
incarcerating persons who violated their administratively-

imposed PRS was a practice of the Division of Parole, and not of [NYS DOCS]").

Second, probable cause appears to have existed for Hardy's prosecution. As discussed above, officers had probable cause to arrest Hardy on the basis of his outstanding PRS violation. Although probable cause at the time of arrest does not automatically provide probable cause for purposes of malicious prosecution claims, "in order for probable cause to dissipate, the groundless nature of the charge must be made apparent by the discovery of some intervening fact." Kinzer v. Jackson, 316 F.3d 139, 144 (2d Cir. 2003).

Hardy does not allege that any information regarding his PRS term or PRS violation came to light between the time of his arrest and the time of his sentencing for his PRS violation, such that the probable cause that existed at the time of arrest might have been vitiated. To be sure, there might be an argument that because Earley had, by the time of Hardy's arrest and parole violation hearing, established the invalidity of administratively imposing PRS, the State should have been taking some measures to rectify its error in imposing such PRS terms on thousands of defendants. However, as the Second Circuit recently noted, it does not appear that NYS DOCS would have had any authority, at that time, to somehow remove Hardy's alleged parole violation from the system, even had its employees been

aware that administratively imposed PRS had been held invalid by the Second Circuit.  See Scott v. Fischer, 2010 WL 2991085, at *8 (explaining that NYS DOCS did not appear to have had the authority to "search[] its records for people who had PRS imposed administratively" to purge such PRS sentences).  Indeed, the New York Court of Appeals did not officially declare administratively imposed PRS to be invalid until 2008, after Hardy's release.  See id.  Further, just as in Knowles, where the court found that probable cause existed for plaintiff's arrest and prosecution based on a facially-valid warrant for a violation of administratively imposed PRS, Hardy here does not deny that he violated his PRS term or allege that the warrant was facially invalid.  See Knowles, 2010 WL 1050973, at *5 (dismissing malicious prosecution claims because probable cause existed for both the arrest and prosecution of plaintiff for violation of administratively imposed PRS, where warrant was facially valid).  Accordingly, probable cause existed to prosecute Hardy based on his PRS violation.[33]

_____

[33] As discussed supra with respect to Hardy's claim of false arrest, defendants would also have a strong claim that even if probable cause did not exist for Hardy's prosecution for violation of administratively imposed PRS, qualified immunity would protect them from this claim.  Although it was clear as of 2007 that the administrative imposition of PRS was unconstitutional, it was not clear how plaintiffs already serving PRS terms that had been administratively imposed were to be treated.  Cf. Ruffins, 2010 WL 1267810, at *1.

Moreover, Hardy has not pled any facts supporting the
favorable termination requirement.  Under New York law, a
defendant "has not obtained a favorable termination of a
criminal proceeding where the outcome is inconsistent with the
innocence the accused."  Martinez v. City of Schenectady, 97
N.Y.2d 78, 84, 761 N.E.2d 560, 564, 735 N.Y.S.2d 868, 872
(2001).  Here, the outcome of Hardy's criminal proceeding is
inconsistent with his innocence and therefore does not
constitute a favorable termination.  Hardy was found guilty of a
parole violation; he testified that he was sentenced to a
ninety-day program with a one-year alternative by a judge at
Rikers Island for his parole violation and that, "as it stands,
the parole violation is a valid parole violation."  50-h Test.
at 20-21; see also Dallas v. Goldberg, 143 F. Supp. 2d 312, 321
(S.D.N.Y. 2001) ("The parole revocation proceedings, which
resulted in a finding of parole violation and remand to custody,
clearly did not terminate favorably for [p]laintiff, thus
vitiating any malicious prosecution claim predicated on those
proceedings.") modified on other grounds, No. 95-CV-9076, 2002
WL 1013291 (S.D.N.Y. May 20, 2002).  Hardy has not alleged that
any later developments have rendered either his PRS or his
conviction for violation of this PRS invalid.[34]

---

[34] In alleging a favorable termination, Hardy seems to confuse
the general invalidation of the practice of administratively

Accordingly, given Hardy's failure to plead an absence of probable cause or a termination in his favor, he has failed to state a claim for malicious prosecution, and defendants' motion to dismiss this claim is granted.

## c. Municipal liability

In a final cause of action, Hardy alleges municipal liability by broadly alleging that "the aforesaid actions by the police . . . were done <u>pursuant to an official municipal policy or custom of the city and state</u>, which policy involved the indiscriminate detention, interrogation, intimidation, denial of medical attention, and prosecution of individuals were [sic] engaged in criminal conduct, and for the purpose of thwarting the fair administration of justice." Am. Compl. ¶ 78 (emphasis added). In order to establish municipal liability, a plaintiff must plead "(1) an official policy or custom that (2) causes the

_____

imposed PRS terms with a favorable termination in his particular case, which he has not yet achieved. <u>See</u> Pl.'s Aff. Opp'n Defs.' Mot. Dismiss at 16 ("[I]t can be inferred that a proceeding was terminated in favor of the Hardy since the sentencing judge did not assign Post Supervision Release."). Although Hardy's 50-h testimony obliquely references a class action lawsuit in which he was challenging the validity of his PRS sentence, he does not allege that his sentence was actually invalidated. To the contrary, it appears that the court, in the action which Hardy refers to, denied relief to Hardy because his claims challenged the validity of his PRS sentence and therefore fell within the scope of habeas corpus. <u>Hardy v. Fischer</u>, No. 08-CV-2460, --- F.Supp.2d ----, 2010 WL 1325368, at *5-7 (S.D.N.Y. Mar. 31, 2010).

plaintiff to be subjected to (3) denial of a constitutional

right." Zahra v. Town of Southold, 48 F.3d 674, 685 (2d Cir.

1995) (quoting Batista v. Rodriguez, 702 F.2d 393, 397 (2d Cir.

1983)); see also Monell v. Dep't of Soc. Servs. of New York, 436

U.S. 658, 691 (1978).

Here, Hardy's precise theory of municipal liability is

unclear.[35]  If Hardy's claim of municipal liability is predicated

on his false arrest and malicious prosecution, Hardy has not

adequately established an underlying constitutional violation,

and thus cannot establish that a city custom or policy led to

any violation.  Cf. Orlik v. Dutchess Cnty., No. 08-CV-1213,

2010 WL 1379776, at *6 (S.D.N.Y. Mar. 25, 2010) ("[B]ecause

[p]laintiffs cannot satisfy the elements of a Fourth Amendment

false arrest or imprisonment claim, they cannot establish that

any policy or custom led to the violation of [their] Fourth

Amendment Rights, and cannot, therefore, establish a Monell

claim on that basis.").

Even broadly construing Hardy's papers to contain a claim

for municipal liability based on the administrative imposition

of PRS, this claim must also fail under Monell.  Although

administrative imposition of PRS has been held to constitute the

deprivation of a constitutional right, Hardy has not alleged any

---

[35] Summary judgment has already been granted to City defendants
on Hardy's claim of municipal liability based on deliberate
indifference to his medical needs, as discussed supra.

policy or custom on the part of the City that caused this practice.  Rather, it appears that NYS DOCS – a state, not city, entity - administratively imposed PRS upon Hardy.  And although Hardy has requested leave to amend his complaint in order to add NYS DOCS as a defendant, leave is denied.  NYS DOCS, as an instrumentality of the state, is immune from suit under § 1983. See Spavone v. New York State Dep't of Corr. Servs., No. 10-CV-0833, 2010 WL 2179965, at *1 (S.D.N.Y. May 27, 2010) (dismissing § 1983 claims against NYS DOCS based on state sovereign immunity because New York State was the real party in interest and § 1983 did not abrogate sovereign immunity).  Accordingly, Hardy has not stated a plausible claim for municipal liability, and defendants' motion to dismiss this claim is granted.

## Conclusion

For the reasons stated above, defendants' motions are granted with respect to Hardy's claims of false arrest and malicious prosecution as against all defendants, and with respect to Hardy's claim of deliberate indifference as against City defendants, Dr. Medard and Willard Correction Officers. Summary judgment is denied on Hardy's claims of deliberate indifference to his medical needs as against P.A. Noriel DeGuzman, the John Doe Correction Officers at Downstate, Nurse Dalecki and other unnamed Willard medical providers, and Dr. Pathak.

Dated: Brooklyn, New York
      August 12, 2010

SO ORDERED:

_____/s/_____
David G. Trager
United States District Judge